1
E. MARTIN ESTRADA
United States Attorney
2
CAMERON L. SCHROEDER
Assistant United States Attorney
3
Chief, National Security Division
ANDREW M. ROACH (Cal. Bar No. 293375)
4
Assistant United States Attorney
Cyber & Intellectual Property Crimes Section
5
    1500 United States Courthouse
    312 North Spring Street
6
    Los Angeles, California 90012
    Telephone: (213) 894-0306
7
    Facsimile: (213) 894-2927
    E-mail:   andrew.roach@usdoj.gov
8
Attorneys for Plaintiff
9
UNITED STATES OF AMERICA

10
                    UNITED STATES DISTRICT COURT

11
              FOR THE CENTRAL DISTRICT OF CALIFORNIA

12
UNITED STATES OF AMERICA,          No. 2:22-CR-00593-PA-1

13
            Plaintiff,             PLEA AGREEMENT FOR DEFENDANT
                                   ANTHONY DAVID FLORES
14
            v.

15
ANTHONY DAVID FLORES,
   aka "Anton David,"

16

17
            Defendant.

18
    1.   This constitutes the plea agreement between Anthony David

19
Flores, aka "Anton David" ("defendant"), and the United States

20
Attorney's Office for the Central District of California (the "USAO")

21
in the above-captioned case.  This agreement is limited to the USAO

22
and cannot bind any other federal, state, local, or foreign

23
prosecuting, enforcement, administrative, or regulatory authorities.

24
                    DEFENDANT'S OBLIGATIONS

25
    2.   Defendant agrees to:

26
        a.   At the earliest opportunity requested by the USAO and

27
provided by the Court, appear and plead guilty to counts one, three,

28
four, five, seven, nine, ten, eleven, and twelve of the indictment in

United States v. Anthony David Flores, No. 2:22-CR-00593-PA-1, which charges defendant with conspiracy to commit mail fraud, in violation of 18 U.S.C. § 1349 (count one), wire fraud, in violation of 18 U.S.C. § 1343 (counts three and four), mail fraud, in violation of 18 U.S.C. § 1341 (counts five and seven), conspiracy to engage in money laundering, in violation of 18 U.S.C. § 1956(h) (count nine), laundering of monetary instruments, in violation of 18 U.S.C. § 1956(a)(1)(B)(i) (counts ten and eleven), and engaging in monetary transactions in property derived from specified unlawful activity, in violation of 18 U.S.C. § 1957(a) (count twelve).

      b.   Not contest facts agreed to in this agreement.

      c.   Abide by all agreements regarding sentencing contained in this agreement.

      d.   Appear for all court appearances, surrender as ordered for service of sentence, obey all conditions of any bond, and obey any other ongoing court order in this matter.

      e.   Not commit any crime; however, offenses that would be excluded for sentencing purposes under United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines") § 4A1.2(c) are not within the scope of this agreement.

      f.   Be truthful at all times with the United States Probation and Pretrial Services Office and the Court.

      g.   Pay the applicable special assessments at or before the time of sentencing unless defendant has demonstrated a lack of ability to pay such assessments.

THE USAO'S OBLIGATIONS

3.   The USAO agrees to:

      a.   Not contest facts agreed to in this agreement.

2

b.   Abide by all agreements regarding sentencing contained in this agreement.

c.   At the time of sentencing, move to dismiss the remaining counts of the indictment against defendant.  Defendant agrees, however, that at the time of sentencing the Court may consider any dismissed charges in determining the applicable Sentencing Guidelines range, the propriety and extent of any departure from that range, and the sentence to be imposed.

d.   At the time of sentencing, provided that defendant demonstrates an acceptance of responsibility for the offenses up to and including the time of sentencing, recommend a two-level reduction in the applicable Sentencing Guidelines offense level, pursuant to U.S.S.G. § 3E1.1, and recommend and, if necessary, move for an additional one-level reduction if available under that section.

<u>NATURE OF THE OFFENSES</u>

4.   Defendant understands that for defendant to be guilty of the crime charged in count one, that is, conspiracy to commit mail fraud, in violation of Title 18, United States Code, Section 1349, the following must be true: (1) beginning on or around May 28, 2018, and ending on date of the indictment, there was an agreement between two or more persons to commit mail fraud, in violation of Title 18, United States Code, Section 1341; and (2) defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

5.   Defendant understands that for defendant to be guilty of the crime charged in counts three and four, that is, wire fraud, in violation of Title 18, United States Code, Section 1343, the following must be true: (1) defendant knowingly participated in,

devised, intended to devise, a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises; (2) the statements made as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) defendant acted with the intent to defraud; that is, the intent to deceive and cheat; and (4) defendant used, or caused to be used, an interstate wire communication to carry out or attempt to carry out an essential part of the scheme.  A defendant may be found guilty of the crime charged even if the defendant did not personally commit the act constituting the crime if the defendant willfully caused an act to be done that if directly performed by him would be an offense against the United States.  A defendant who puts in motion or causes the commission of an indispensable element of the offense may be found guilty as if he had committed this element himself.

6.   Defendant understands that for defendant to be guilty of the crime charged in counts five and seven, that is, mail fraud, in violation of Title 18, United States Code, Section 1341, the following must be true: (1) defendant knowingly participated in, devised, intended to devise, a scheme or plan to defraud, or a scheme or plan for obtaining money or property by means of false or fraudulent pretenses, representations, or promises; (2) the statements made as part of the scheme were material; that is, they had a natural tendency to influence, or were capable of influencing, a person to part with money or property; (3) defendant acted with the intent to defraud; that is, the intent to deceive and cheat;

and (4) defendant used, or caused to be used, the mails to carry out or attempt to carry out an essential part of the scheme.

7.   Defendant understands that for defendant to be guilty of the crime charged in count nine, that is, conspiracy to launder monetary instruments, in violation of Title 18, United States Code, Section 1956(h), the following must be true:

(1) There was an agreement between two or more persons:

a.   to conduct a financial transaction involving property that represented the proceeds of wire fraud, in violation of Title 18, United States Code, Section 1343, where defendant knew that the property represented the proceeds of some form of unlawful activity, and defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds; or

b.   to knowingly engage or attempt to engage in a monetary transaction in the United States in criminally derived property that had a value greater than $10,000 and was, in fact, derived from wire fraud, in violation of Title 18, United States Code, Section 1343; and

(2) Defendant became a member of the conspiracy knowing of at least one of its objects and intending to help accomplish it.

8.   Defendant understands that for defendant to be guilty of the crime charged in counts ten and eleven, that is, laundering monetary instruments, in violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), the following must be true: (1) defendant conducted a financial transaction involving property that represented the proceeds of wire fraud, in violation of Title 18, United States Code, Section 1343; (2) defendant knew that the property represented

5

the proceeds of some form of unlawful activity; and (3) defendant knew that the transaction was designed in whole or in part to conceal or disguise the nature, location, source, ownership, or control of the proceeds.  A defendant may be found guilty of the crime charged even if the defendant did not personally commit the act constituting the crime if the defendant willfully caused an act to be done that if directly performed by him would be an offense against the United States.  A defendant who puts in motion or causes the commission of an indispensable element of the offense may be found guilty as if he had committed this element himself.

9.   Defendant understands that for defendant to be guilty of the crime charged in count twelve, that is, money laundering, in violation of Title 18, United States Code, Section 1957, the following must be true: (1) defendant knowingly engaged or attempted to engage in a monetary transaction; (2) defendant knew the transaction involved criminally derived property; (3) property had a value greater than $10,000; (4) property was, in fact, derived from wire fraud, in violation of Title 18, United States Code, Section 1343; and (5) the transaction occurred in the United States.

<u>PENALTIES AND RESTITUTION</u>

10.   Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1349, that is, conspiracy to commit mail fraud, as charged in count one, is: 20 years of imprisonment; a three-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

11.    Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1343, that is, wire fraud, as charged in counts three and four, is: 20 years of imprisonment; a three-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

12.    Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1341, that is, mail fraud, as charged in counts five and seven, is: 20 years of imprisonment; a three-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

13.    Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1956(h), that is, conspiracy to launder monetary instruments, as charged in count nine, is: 20 years of imprisonment; a three-year period of supervised release; a fine of $500,000 or twice the gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

14.    Defendant understands that the statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1956(a)(1)(B)(i), that is, laundering of monetary instruments, as charged in counts ten and eleven, is: 20 years of imprisonment; a three-year period of supervised release; a fine of $500,000 or twice the gross gain or gross loss resulting from the

offense, whichever is greatest; and a mandatory special assessment of
$100.

15.  Defendant understands that the statutory maximum sentence
that the Court can impose for a violation of Title 18, United States
Code, Section 1957, that is, money laundering, as charged in count
twelve, is: 10 years of imprisonment; a three-year period of
supervised release; a fine of $250,000 or twice the gross gain or
gross loss resulting from the offense, whichever is greatest; and a
mandatory special assessment of $100.

16.  Defendant understands, therefore, that the total maximum
sentence for all offenses to which defendant is pleading guilty is:
170 years of imprisonment; a three-year period of supervised release;
a fine of $3,000,000 or twice the gross gain or gross loss resulting
from the offenses, whichever is greatest; and a mandatory special
assessment of $900.

17.  Defendant understands that defendant will be required to
pay full restitution to the victim of the offenses to which defendant
is pleading guilty.  Defendant agrees that, in return for the USAO's
compliance with its obligations under this agreement, the Court may
order restitution to persons other than the victim of the offenses to
which defendant is pleading guilty and in amounts greater than those
alleged in the counts to which defendant is pleading guilty.  In
particular, defendant agrees that the Court may order restitution to
any victim of any of the following for any losses suffered by that
victim as a result: (a) any relevant conduct, as defined in U.S.S.G.
§ 1B1.3, in connection with the offenses to which defendant is
pleading guilty; and (b) any counts dismissed and charges not
prosecuted pursuant to this agreement as well as all relevant

conduct, as defined in U.S.S.G. § 1B1.3, in connection with those counts and charges.

18. Defendant understands that supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements. Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release authorized by statute for the offense that resulted in the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

19. Defendant understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury. Defendant understands that he is pleading guilty to a felony and that it is a federal crime for a convicted felon to possess a firearm or ammunition. Defendant understands that the convictions in this case may also subject defendant to various other collateral consequences, including but not limited to revocation of probation, parole, or supervised release in another case and suspension or revocation of a professional license. Defendant understands that unanticipated collateral consequences will not serve as grounds to withdraw defendant's guilty pleas.

20. Defendant and his counsel have discussed the fact that, and defendant understands that, if defendant is not a United States citizen, the convictions in this case makes it practically inevitable and a virtual certainty that defendant will be removed or deported

from the United States.  Defendant may also be denied United States citizenship and admission to the United States in the future. Defendant understands that while there may be arguments that defendant can raise in immigration proceedings to avoid or delay removal, removal is presumptively mandatory and a virtual certainty in this case.  Defendant further understands that removal and immigration consequences are the subject of a separate proceeding and that no one, including his attorney or the Court, can predict to an absolute certainty the effect of his convictions on his immigration status.  Defendant nevertheless affirms that he wants to plead guilty regardless of any immigration consequences that his pleas may entail, even if the consequence is automatic removal from the United States.

FACTUAL BASIS

21.  Defendant admits that defendant is, in fact, guilty of the offenses to which defendant is agreeing to plead guilty.  Defendant and the USAO agree to the statement of facts provided below and agree that this statement of facts is sufficient to support pleas of guilty to the charges described in this agreement and to establish the Sentencing Guidelines factors set forth in paragraph 23 below but is not meant to be a complete recitation of all facts relevant to the underlying criminal conduct or all facts known to either party that relate to that conduct.

Beginning sometime after June 23, 2017, and continuing through the date of indictment, defendant Anthony David Flores, also known as "Anton David" ("defendant Flores"), knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud the victim as to material matters, and to obtain money and property

1  by means of material false and fraudulent pretenses, representations,

2  and promises, and the concealment of material facts.

3  Defendants Meet the Victim

4      Before meeting the victim on June 23, 2017, defendant Flores and

5  his codefendant and then-romantic partner Anna Rene Moore ("defendant

6  Moore") lived in Fresno, California, where they operated a window

7  cleaning business and yoga studio.  The victim, on the other hand,

8  was a wealthy ophthalmologist and investor, with a history of mental

9  illness and was diagnosed with bipolar disorder.  The victim had

10  recently been released from the hospital after several involuntary

11  psychiatric hospitalizations.

12      Defendants first met the victim by chance, at a Los Angeles-area

13  ice cream shop on June 23, 2017.  Defendants were visiting Los

14  Angeles from Fresno at the time.  After their initial encounter,

15  defendants began staying with the victim at the victim's beachfront

16  home in Malibu, California (the "Beach House").

17      Within weeks of defendants first meeting him, the victim was

18  arrested and hospitalized after he engaged in erratic and manic

19  behavior in early July 2017.  Defendants visited the victim in the

20  hospital and assisted with his discharge from the hospital in July

21  2017.  Defendants continued to live with the victim until around July

22  20, 2017, when the victim evicted defendants from the Beach House

23  during a manic episode.  Afterward, defendants returned to Fresno.

24  Defendant Flores later sent a letter to the victim's elderly mother

25  in Florida requesting payment for his services in providing care to

26  the victim.

27      During the next ten days between July 20 and July 30, 2017, the

28  victim was alone and was arrested on three separate occasions for

bizarre behavior.  As a result of his diminished mental state and arrests, the victim was detained at the Twin Towers Correctional Facility from approximately July 30, 2017 to September 17, 2017, where he spent most of his time in the forensic in-patient program. During his time in custody, the victim was declared incompetent to stand trial on his pending criminal charges.

The victim's elderly mother in Florida was initially unable to locate the victim while he was in custody.  She contacted defendant Flores, whom she learned was a new friend and caregiver of the victim, and she requested that defendant Flores help locate her son. Defendants then traveled from Fresno to Los Angeles to help locate the victim.  By mid-August 2017, the victim's mother and defendant Flores learned that the victim was in custody.  Between mid-August 2017 and September 1, 2017, the victim's mother had several discussions with others, including defendant Flores, about placing her son in a conservatorship.

The Power of Attorneys

In early September 2017, the victim -- who was still in custody -- called defendant Flores and requested that defendant Flores bail the victim out of jail.  During recorded jail calls, defendant Flores told the victim that the victim's mother was attempting to get a power of attorney or conservatorship over the victim, and that defendant Flores was fighting to stop her.  In later calls, defendant Flores told the victim that his mother had hired a conservatorship attorney and wanted to take control of the Beach House to rent it out and use the funds for the victim's care.  Defendant Flores told the victim that he knew that was not what the victim wanted, because, as defendant Flores stated in the recorded call jails, the victim had

previously "made that very clear to me [defendant Flores] that nobody is to have the beach house except the Johns Hopkins Institute."

While in custody, the victim signed two powers of attorney granting defendant Flores power over the victim's finances. Defendant Flores told the victim on the recorded jail calls that it would be a "very limited" power of attorney and only used to manage the victim's affairs while he was in custody and then post bail. Defendant Flores told the victim that he was "welcome" to "get rid" of it as soon as the victim was released from custody.  Defendant Flores stated that he loved the victim and wanted him to be happy and healthy, adding that he had no interest in the victim's money.

The victim executed two powers of attorneys granting defendant Flores access to the victim's finances, on September 9 and 12, 2017. The day after the first power of attorney was signed, defendant Flores texted a friend the following, "PS . . . I got Power of attorney for the beach house."  His friend responded: "Boom." Defendant Flores then used these powers of attorney to bail the victim out of jail.  The victim was released from custody on September 17, 2017.

Defendant Flores Accesses the Victim's Wealth with the PoAs

After the victim's release from custody, defendant Flores exercised significant control over the victim's life.  Defendant Flores used the powers of attorneys to access the victim's financial accounts.  Between September 27, 2017 and November 9, 2017, defendant Flores opened three different power-of-attorney bank accounts in the victim's name with defendant Flores listed as an authorized user and power of attorney on each account (the "PoA Accounts").  One of the PoA Accounts, the Chase account ending in 4782 (the "PoA Account"),

served as the defendants' and victim's primary "joint" bank account during defendants' time with the victim.

While defendant Flores was opening these PoA Accounts, the victim began a series of extensive ketamine infusion treatments for treatment of his depression.  The ketamine treatments were prescribed by a licensed physician at a local ketamine clinic.  Defendant Flores facilitated these treatments and took the victim to and from the clinic for the victim's infusions.  The victim received his first series of ketamine infusions on October 4, 6, 10, 11, and 13, 2017.

In mid-October 2017, defendant Flores also assisted the victim with multiple financial transactions.  For example, on October 13, 2017, defendant Flores assisted the victim in cashing out the victim's long-held permanent life insurance policy for the cash surrender value of $446,872.23.  Defendant Flores helped fill out the forms and signed the form as a witness to the victim's signature. That money was later deposited into the PoA Account, where it was spent in a matter of months.  That same day, October 13, 2017, defendant Flores called Interactive Brokers and attempted to withdraw $1 million from the victim's $60-million stock portfolio account. During the recorded call, defendant Flores identified himself as the victim's "personal assistant" and "power of attorney," and he then briefly placed the victim on the call, who confirmed he needed "spending money."  This transfer, however, did not go through, and a smaller $50,000 transfer was later made from the Interactive Brokers account to the PoA Account.

Defendant Flores had access to all the funds in the PoA Accounts, including through a debit card connected to the main PoA Account.  Defendant Flores would use the main PoA Account to pay for

all the victim's expenses, including food, medical care, and taxes, in addition to paying for both his and defendant Moore's own personal expenses.  Defendants Flores and Moore also used funds from the PoA account to hire over a dozen assistants and other staff, whom defendants Flores and Moore would have work on various projects for both the victim and themselves, including defendant Flores's nascent public relations company called 3rd Star Creative, and defendants' window cleaning business and yoga studio.  Defendants hired many of these assistants to purportedly work for 3rd Star Creative, which defendant Flores was trying to develop into a brand during his time with the victim.  All these assistants, however, were paid for with the victim's funds.  Defendant Flores would represent to others, including the assistants and defendant Moore, that the victim approved of his use of the victim's funds for things such as this, because the victim had purportedly become an "investor" in all of defendant Flores's ventures.

Defendants' Time with the Victim

Defendants lived fulltime with the victim at the Beach House following the victim's release from custody on September 17, 2017, until days before the victim's death on May 27, 2018.  During his time at the Beach House, defendant Flores continued to hold himself out as the victim's power of attorney, guardian, caretaker, friend, and a confidante.  In this role, defendant Flores exercised great control over the victim's life, including managing his financial affairs, managing the Beach House, managing the dozen or so staff and assistants that worked for defendants and the victim, arranging the victim's medical appointments, managing his medications, and hiring various attorneys for the victim's ongoing criminal cases and a

separate medical board investigation, among other tasks.  Defendant
Flores also interacted with victim's only family members, including
the victim's elderly mother and the victim's few long-time friends
and neighbors.

As part of his control over the victim, defendant Flores would
control what information was relayed to the victim and who could
communicate with the victim.  Defendant Flores also withheld
information from the victim.  Defendant Flores, for example,
instructed assistants and the victim's treating physicians to not
discuss or raise financial issues with the victim.  Defendant Flores
also directed the household assistants to frequently check the
victim's mail and remove all legal and financial documents from the
victim's incoming mail.

For the bulk of the time that defendants lived with the victim,
between October 2017 and early May 2018, the victim was predominantly
in a depressed state.  He spent most of his time at the Beach House,
getting hours of massages, which defendants arranged for him each and
every day.  The victim also consumed both prescribed and unprescribed
drugs, which defendants —- primarily defendant Flores —- either
facilitated the victim in receiving or directly provided.  The
victim, for example, received approximately 43 prescribed ketamine
infusions between October 2017 and his death in May 2018.  The
ketamine infusions were provided by a licensed physician for
treatment of the victim's depression.  When the treating ketamine
physician expressed alarm at the frequency of the victim's infusions,
defendant Flores specifically requested that they continue and told
the physician that the victim wanted to maintain the frequency, as it
was the only thing that brought him joy.  The treating ketamine

physician separately spoke with the victim, who confirmed he wanted to continue with the treatments.  Defendant Flores also provided the victim with other drugs, including marijuana and psilocybin mushrooms, which were consumed between and in conjunction with the victim's prescribed ketamine treatments, and which were unbeknown to the victim's treating physicians.

Within approximately six months of living together, by late March 2018, defendants had spent approximately $600,000 of the victim's funds, depleting the cash balance in the PoA Account.[1]  In response, defendant Flores prepared a two-page written request for an additional $1 million from the victim.  The victim agreed to this request and helped initiate a transfer of $1 million from his Interactive Brokers account to the PoA Account.  The transfer was problematic and took multiple attempts and several days to clear. The transfer finally went through and was deposited into the PoA Account on April 5, 2018.  Through this process, defendant Flores learned how to successfully conduct a wire transfer from the victim's Interactive Brokers account.

Financial Transfers Before the Victim's Death

Approximately two weeks before the victim's death, on May 13, 2018, defendants Flores and Moore took lysergic acid diethylamide ("LSD") with the victim at the victim's request.  The victim believed that it would help his depression.  After the initial LSD experience, defendant Flores continued to administer LSD to the victim, giving

---

[1] The initial amount in the PoA Account was funded from the surrender of the victim's life insurance policy, a $100,000 transfer from victim's Fidelity account, and a $50,000 transfer from victim's Interactive Brokers account.

the victim LSD on multiple occasions within the final two weeks of the victim's life.

The victim entered a manic stage following the ingestion of LSD. Massage therapists and assistants in the Beach House observed the victim act markedly different during this time.  The victim became increasingly erratic and difficult to be around.  Defendant Flores also reported to the victim's physician that he was worried that the victim's mania might be returning.

Given the victim's severe mood swings and instability, defendant Flores became fearful that the victim would evict him and defendant Moore from the Beach House, as the victim had done the previous summer, and cut off defendant Flores's access to the PoA Account and the victim's money.  This would have severely impacted defendants' lifestyle as well as their business and other ventures, which were all now heavily reliant upon the victim's wealth to operate.

Accordingly, on or around May 23, 2018, hours after the victim took LSD on another occasion, defendant Flores initiated two $1 million transfers from the victim's Interactive Brokers account to the PoA Account on the evening of May 23, 2018.  These transfers were made without the victim's knowledge, consent, or approval; and unlike the prior transfer in April, there was no genuine reason for the transfer when the PoA Accounts still had an available balance of approximately $700,000 given the recent cash infusion.

Within minutes of the transfers, defendant Flores directed a male assistant to call Interactive Brokers and impersonate the victim to check on the status of the wire transfers.  Defendant Flores directed the male assistant to ensure that defendant Flores's cell phone number and an email address that defendant Flores controlled

18

were listed on the account, so that the victim would not receive
notifications of the pending wire transfers.

By causing the initiation of the wire transfers on May 23, 2018,
while logged into the victim's Interactive Brokers account, defendant
Flores caused a false representation to be transmitted by interstate
wire communication with the intent to defraud, namely, defendant
Flores deceived Interactive Brokers into believing that the victim
had personally approved and consented to the wire transfers, which
caused Interactive Brokers to later release these funds from the
victim's funds to the PoA Account, where defendant Flores could and
did access them.

The following day, on May 24, 2018, the first $1 million wire
transfer initiated the day before was deposited into the PoA Account.
Within minutes of the $1 million deposit, defendant Flores caused the
money to be transferred to his personal bank account.

That same day, the victim received his final ketamine infusion.
According to medical reports, the victim appeared to be manic and
"behaved very oddly compared to how he normally is," and the ketamine
infusion was terminated early.

In sum, between May 23, 2018 and continuing through May 24,
2018, defendant Flores caused three transfers, totaling
$1,676,179.32, from the PoA Accounts in the victim's name to bank
accounts in defendant Flores's name only.

Defendants' Departure from the Beach House and Victim's Death

On May 25, 2018, defendants Flores and Moore departed the Beach
House.  The victim was in a manic state at the time they departed.
The victim was pacing around the Beach House, refusing to make eye

contact with others, twitching his head, and occasionally talking to himself or laughing randomly, all consistent with a manic episode.

Defendants relocated to a hotel in Santa Monica, California, where they rented a room using the victim's funds.  The victim remained at the Beach House under the supervision of assistants and massage therapists.  Defendant Flores had access to video cameras in the Beach House and monitored the victim's worsening condition over the next two days.  He routinely provided instructions to those at the Beach House on what to do and how to respond to the victim's manic episode.

The victim died at the Beach House on May 27, 2018, at the age of 57 years old.  The corner determined the victim's death was an accident and caused by the combination of ketamine and ethanol intoxication.  A second, privately performed autopsy determined the cause of death to be the result of a dilated cardiomyopathy and a congenitally narrow right coronary artery.  Blood toxicology reports from the second autopsy revealed "therapeutic levels of ketamine and a small amount of ethanol," which it determined "did not significantly contribute to the immediate cause of death."

The Conspiracy to Defraud the Victim's Estate

Beginning sometime after the victim's death on May 27, 2018, and continuing through at least October 19, 2019, in Los Angeles County, within the Central District of California, defendant Flores and defendant Moore knowingly conspired with each other to defraud the victim's estate after the victim's death, through resisting efforts from the victim's estate to recover funds misappropriated from the victim, and later through the filing of false creditor's claims against the victim's estate.  During the same time, defendants Flores

and Moore also conspired with each other to commit money laundering,
that is, (a) to conduct financial transactions involving property
that represented the proceeds of wire fraud from the victim's estate,
where defendants knew that the property represented the proceeds of
some form of unlawful activity, and defendants knew that the
transactions were designed in whole or in part to conceal or disguise
the nature, location, source, ownership, or control of the proceeds;
and (b) to engage in monetary transactions in criminally derived
property that had a value greater than $10,000 and that was, in fact,
derived from wire fraud from the victim's estate.

<u>Defendants' Actions after Victim's Death</u>

The day after the victim's death, defendant Flores had a private
phone call with his mother, during which they discussed what should
be said about the victim's death and how to leverage the situation.
Defendant Flores took notes during this call, and he texted defendant
Moore the following notes from the call, "Good friend under difficult
circumstances . . . We bonded and he trusted me . . . With a
promise that I be promised a monetary amount he said take care of the
[h]ouse and I want to you 20million." Defendant Flores then
conferenced defendant Moore into the call with defendant Flores and
his mother. Defendant Flores's mother expressed concern that
defendant Flores would be held criminally responsible for the
victim's death, and she told defendant Moore that they were counting
on her to ensure that defendant Flores was not held responsible for
the victim's death.

That same day, May 28, 2018, defendant Flores immediately hired
an attorney, paying with the victim's funds. Defendant Flores used
this attorney, and later attorneys, to help him devise ways to keep

the fraudulently obtained funds that he caused to be deposited into his account.  Defendant Flores, however, failed to provide this attorney with the full and complete facts of his relationship with the victim, the source of the funds, or the circumstances of the transfers that made their way into defendant Flores's personal accounts, including the victim's LSD use at the time of the transfers, among others.

Defendants returned to live at the Beach House after the victim's death.  On or about the evening of May 28, 2018, defendant Flores, defendant Moore, and an assistant were reviewing the victim's financial accounts at the request of defendants' recently hired attorney.  At a certain point, the assistant informed defendant Flores that the assistant had logged into the victim's Interactive Brokers account and saw that one of two $1-million transfers initiated from the victim's Interactive Brokers account to the PoA Account on May 23, 2018, was still pending and required further approval.  Defendant Flores instructed the assistant to approve the pending $1-million wire transfer, which the assistant did at defendant Flores's direction.  By causing the approval of the transfer that day, while logged into the deceased victim's Interactive Brokers account, defendant Flores caused a false representation to be transmitted by interstate wire communication with the intent to defraud, namely, defendant Flores deceived Interactive Brokers into believing that the victim had personally approved and released the pending wire transfer (despite the victim's death a day earlier), which caused Interactive Brokers to release $1 million from the victim's funds to the PoA Account, where defendant Flores could and did access them.

1   After instructing the assistant to approve the transfer,

2   defendant Flores looked at both the assistant and defendant Moore and

3   told them words to the effect of that they "weren't here" and that

4   they did not witness this transaction.  Defendant Flores later told

5   defendant Moore that no one would question the second transfer that

6   he caused, because it would appear as if this transfer was initiated

7   by the victim on May 23, 2018, and that it just took a few days to

8   process.  Defendant Flores later caused the transfer of this

9   $1 million into his personal accounts.

10  The Litigation over the Victim's Estate

11  Defendants continued to live at the Beach House for several

12  weeks following the victim's death until the victim's family

13  threatened legal action if defendants refused to leave.

14  Around late June and July 2018, the victim's family learned of

15  the transfers made to defendant Flores's accounts immediately before

16  and after the victim's death.  Before that time, the victim's family

17  had no knowledge of the victim's true wealth.  Defendant Flores was

18  aware of this fact, and he had previously made statements to the

19  victim's mother suggesting that the victim was destitute.  After

20  learning of the transfers, the victim's family filed a probate

21  petition against defendants, alleging claims of fraud, elder abuse,

22  and conversion, to invalidate the transfers.

23  Later, on October 30, 2018, the victim's family filed a separate

24  civil lawsuit in the Los Angeles Superior Court against defendants

25  for the same relief.  Neither defendant Flores nor defendant Moore

26  disclosed the full circumstances of two $1-million transfers during

27  the subsequent civil litigation over the victim's estate.  Rather,

28  both defendants Flores and Moore provided false and misleading

information about transfers.  For example, the complaint filed in the civil litigation on October 30, 2018, alleged that, "On May 29, 2018 (two days after [the victim's] death), [defendant Flores] made a $1 million disbursement from [the victim's] investment account to a bank account held in [the victim's] and [defendant Flores's] name." On April 4, 2019, defendant Flores signed a verified answer under the penalty of perjury which denied that allegation and stated, "The $1,000,000 transfer was initiated by [the victim] before his passing and took several days to clear."  Defendant Flores made similar statements in sworn written discovery responses.  Defendant Flores knew these statements were false and misleading when he made them, as he had initiated the transfers before the victim's death without the victim's knowledge, and he released the pending transfer on the evening of May 28, 2018, after the victim's death.

Defendants transferred funds originating from the victim's Interactive Brokerage account, including the two $1-million transfers that defendant Flores caused to be transferred, to multiple accounts in their separate and joint names.  Defendants Flores and Moore opened a joint Chase account ending in 1620 on June 29, 2018.  The following day, June 30, 2018, defendants caused the transfer of approximately $2 million of the victim's funds from defendant Flores's personal Chase account ending in 2035 to defendants' joint Chase account ending in 1620.  On July 18, 2018, defendants caused a transfer of $499,697.86 from defendant Flores's personal Chase account ending in 2035 to a new joint bank account in defendant's names, the Chase account ending in 6109.  On September 4, 2018, defendant Moore opened a joint account in both defendants' names at

Vanguard Group.  Defendants transferred $2.3 million from their joint Chase account ending in 1620 to the newly created Vanguard account.

All these transactions involved funds that originated from the victim's accounts.  Defendant Flores participated in these transfers knowing that the money transferred was the proceeds of some form of unlawful activity, namely, defendant Flores's unauthorized transfer of two $1-million wires from the victim's Interactive Brokers account, and knowing that these transactions were designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, control, or proceeds of the funds in these accounts.

Defendants' Violation of Court Orders

In the summer and fall of 2018, the victim's estate attempted to recover the funds taken from victim's accounts immediately before and after the victim's death.  In the civil lawsuit against defendants, the victim's estate sought judicial orders to compel defendants to return the victim's funds.  But this lawsuit did not stop the defendants, and they violated court orders in the civil action ordering them to return the victim's funds to the victim's estate.

On November 9, 2018, the court in the civil action appointed a receiver and issued a temporary restraining order ("TRO") enjoining defendants from transferring, concealing, retaining, or dissipating any funds from the victim's accounts, and it further ordered defendants to return all funds from the victim's accounts to the receiver immediately.  Defendants Flores and Moore were served with these orders on November 13, 2018 and November 17, 2018.  Defendants were fully aware of the TRO no later than November 15, 2018, after a Vanguard account representative told them that their account had been frozen due to a legal hold during a recorded phone call.

Despite the TRO, defendants did not surrender the funds to the receiver as required. Rather, defendants attempted to wire funds to new accounts and make multiple cash withdrawals. Just hours after Vanguard informed defendants that their account was frozen, and notwithstanding the TRO, defendants Flores and Moore visited multiple bank branches and attempted to withdraw money from their accounts during the afternoon of November 15, 2018. Defendants ultimately made two $10,000-withdrawals from their Citibank accounts on November 15, 2018. The same day, on November 15, 2018, defendants later made a wire payment of $100,000 in funds originating from the victim's accounts to attorneys they retained to represent them in civil litigation, all in violation of the TRO.

In a further attempt to obstruct the TRO, defendants Flores and Moore traveled to South Dakota on January 10, 2019, to new open new bank accounts at First Premier Bank under a new corporate entity. Defendants opened these bank accounts to cash $30,000 in checks from funds originating from the victim's accounts, which they were previously ordered to return to the receiver, as required by the TRO. Defendant Flores participated in the above-mentioned transactions, along with defendant Moore, knowing that the money was the proceeds of some form of unlawful activity, namely, defendant Flores's two $1-million unauthorized transfers on May 23, 2018, from the victim's Interactive Brokers account, and knowing that these transactions were designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, control, or proceeds of the funds in these accounts, namely, these transactions were intended to prevent the victim's estate from recovering the victim's funds, in violation of the TRO ordering defendants to return all funds to the receiver.

1  The Creditor's Claims filed Against the Victim's Estate

2          In late 2018 and early 2019, as the receiver recovered the

3  victim's funds on behalf of the estate, defendant Flores devised a

4  scheme, which defendant Moore knowingly participated in, to obtain

5  money from the victim's estate by means of false and fraudulent

6  pretenses, representations, and promises.  Defendant Flores devised

7  this scheme with the intent to defraud the victim's estate.

8  Specifically, the scheme attempted to (1) justify defendants'

9  retention of the approximate $2.7 million that defendant Flores had

10  transferred from the victim's accounts immediately before and after

11  the victim's death; and (2) attempt to defraud the victim's estate of

12  even more money.  Over the course of months, defendant Flores devised

13  this scheme as he continually altered defendants' explanations for

14  why defendants were purportedly entitled to retain the money

15  transferred to them before and after the victim's death, and why

16  defendants should receive more money from the victim's estate.  The

17  explanations for why defendants were purportedly entitled to money

18  from the victim's estate evolved over the course of many months, and

19  they discussed filing various claims against the victim's estate,

20  including wage and hour claims, sexual harassment, and other claims.

21  Defendant Flores also coached defendant Moore as to what they should

22  say in the civil litigation.  Defendant Flores's claims to funds from

23  the estate were premised on an ever-changing series of

24  justifications, including: (1) claims based on the effect of the

25  power of attorney; (2) various fabricated pending business deals

26  between defendants Flores and Moore and victim; and (3) claims that

27  the victim "promised" defendants Flores and Moore an inheritance of

28

1   one-third of the victim's estate and the Beach House and was on the

2   verge of changing his will before he died.

3       In furtherance of defendants' scheme to defraud the victim's

4   estate through these false and misleading representations, defendants

5   Flores and Moore caused the mailing of four false creditor's claims,

6   two by each of them, against the victim's estate on January 16, 2019,

7   claiming that the victim had jointly promised them an inheritance of

8   one-third of the victim's $60-million estate and the Beach House.

9   Defendants Moore and Flores listed the facts supporting their

10  purported claims of an inheritance on each creditor's claim and

11  signed the creditor's claims under the penalty of perjury affirming

12  that the statements therein were "true and correct."  Both defendants

13  were involved in the drafting of the creditor's claims, however,

14  defendant Flores took primary responsibility for devising the dates

15  of such purported promises and instructed defendant Moore what to

16  write.  Defendant Flores told defendant Moore that such statements

17  must be included to make their claims viable, even though he knew

18  them not to be true.

19      Below are some examples of the representations in the creditor's

20  claims, which defendant Flores represented under the penalty of

21  perjury were "true and correct," and which defendant Flores knew were

22  false and misleading.  Defendant Flores knew these statements were

23  false and misleading, but made them nonetheless as part of

24  defendants' scheme, which he knew was to defraud the victim's estate

25  by demanding money that defendants were not lawfully entitled.

26  //

27  //

28  //

Example #1

The creditor's claims stated that on October 28, 2017, the victim purportedly "told Flores and Moore that [the victim] intended to leave Flores and Moore an inheritance and his Beach House."

Defendant Flores knew this statement was false or misleading, as victim never made such statement about an inheritance to defendant Flores on that date.

Example #2:

The creditor's claims stated that on Thanksgiving Day (November 23, 2017), the victim "specifically stated to Flores that he wanted Flores to have 1/3 of [the victim's] Estate. . . .  After dinner, [the victim] verbally promised that Flores and Moore would inherit one-third (1/3) of his Estate, and that they should donate the rest of his Estate to the Johns Hopkins University and the Wilmer Eye institute."

Defendant Flores knew this statement was false or misleading, because while the victim mentioned, in passing, that he had so much money that defendants could split it between themselves and the Johns Hopkins and Wilmer Eye Institute if he passed, defendant Flores knew that the victim never made any such promise of an inheritance to them on that date, nor did he promise any specific amount to them on that date.

Example #3

The creditor's claims stated that on Christmas Day (December 25, 2017), while defendants Flores and Moore, and the victim were

> [E]njoy[ing] Christmas morning together at [the victim's] Beach House with some friends. . . . [The victim] asked Flores and Moore what they wanted for Christmas.  Flores responded, 'For Christmas, I want for all beings to be happy and well.' Moore responded, 'For Christmas, I want prosperity and abundance for

all beings." [The Victim] replied, 'Ha, I think you can find that with 1/3 of my Estate and your Beach House.'

Defendant knew this statement was false or misleading, because the victim never told him on Christmas Day -- or any other day for that matter -- that they would receive one-third of his estate or his Beach House as an inheritance.

After extensive litigation with the victim's estate, defendants Flores and Moore entered into a settlement agreement with the estate. As part of the settlement agreement, defendants agreed to a non-dischargeable, joint and severally liable judgment of $1,000,000 against them in favor of the victim's estate.  Defendants Flores and Moore also agreed to withdraw their creditor's claims against the estate, which they did on July 17, 2019 -- approximately six months after defendants filed the creditor's claims.

SENTENCING FACTORS

22.  Defendant understands that in determining defendant's sentence the Court is required to calculate the applicable Sentencing Guidelines range and to consider that range, possible departures under the Sentencing Guidelines, and the other sentencing factors set forth in 18 U.S.C. § 3553(a).  Defendant understands that the Sentencing Guidelines are advisory only, that defendant cannot have any expectation of receiving a sentence within the calculated Sentencing Guidelines range, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court will be free to exercise its discretion to impose any sentence it finds appropriate up to the maximum set by statute for the crimes of conviction.

23.   Defendant and the USAO agree to the following applicable Sentencing Guidelines factors:

| | | | |
|---|---|---|---|
| Base Offense Level: | | 7 | U.S.S.G. § 2B1.1(a)(1) |

Specific Offense Characteristics:

| | | | |
|---|---|---|---|
| - Loss amount more than $3,500,000 | | +18 | U.S.S.G. § 2B1.1(b)(1)(J) |
| - Violation of court order | | +2 | U.S.S.G. § 2B1.1(b)(9)(C) |
| - § 1956 Conviction | | +2 | U.S.S.G. § 2S1.1(b)(2)(B), <u>Id.</u>, App. Note 6, U.S.S.G. § 3D1.2(c) |

Adjustments:

| | | | |
|---|---|---|---|
| - Vulnerable Victim Enhancement | | +2 | U.S.S.G. § 3A1.1(b) |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics (including loss amount), adjustments, and departures under the Sentencing Guidelines are appropriate; however, the defendant and USAO agree that the above calculations are consistent with the facts of this case.

24.   Defendant understands that there is no agreement as to defendant's criminal history or criminal history category.

25.   Defendant and the USAO reserve the right to argue for a sentence outside the sentencing range established by the Sentencing Guidelines based on the factors set forth in 18 U.S.C. § 3553(a)(1), (a)(2), (a)(3), (a)(6), and (a)(7).

<u>WAIVER OF CONSTITUTIONAL RIGHTS</u>

26.   Defendant understands that by pleading guilty, defendant gives up the following rights:

       a.   The right to persist in a plea of not guilty.

       b.   The right to a speedy and public trial by jury.

c.    The right to be represented by counsel -- and if necessary have the Court appoint counsel -- at trial.  Defendant understands, however, that, defendant retains the right to be represented by counsel -- and if necessary have the Court appoint counsel -- at every other stage of the proceeding.

d.    The right to be presumed innocent and to have the burden of proof placed on the government to prove defendant guilty beyond a reasonable doubt.

e.    The right to confront and cross-examine witnesses against defendant.

f.    The right to testify and to present evidence in opposition to the charges, including the right to compel the attendance of witnesses to testify.

g.    The right not to be compelled to testify, and, if defendant chose not to testify or present evidence, to have that choice not be used against defendant.

h.    Any and all rights to pursue any affirmative defenses, Fourth Amendment or Fifth Amendment claims, and other pretrial motions that have been filed or could be filed.

WAIVER OF APPEAL OF CONVICTION, SENTENCE, AND COLLATERAL ATTACK

27.  Defendant understands that, with the exception of an appeal based on a claim that defendant's guilty pleas were involuntary, by pleading guilty defendant is waiving and giving up any right to appeal defendant's convictions on the offenses to which defendant is pleading guilty.  Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that

the statement of facts provided herein is insufficient to support
defendant's pleas of guilty.

28.   Defendant gives up the right to appeal all of the
following: (a) the procedures and calculations used to determine and
impose any portion of the sentence; (b) the term of imprisonment
imposed by the Court, including, to the extent permitted by law, the
constitutionality or legality of defendant's sentence, provided it is
within the statutory maximum; (c) the fine imposed by the Court,
provided it is within the statutory maximum; (d) the amount and terms
of any restitution order, provided it requires payment of no more
$1,000,000 to be jointly and severally liable with defendant Anna
Rene Moore, and provided it includes offset for any payments made on
the $1,000,000 stipulated judgment entered against defendants Anthony
David Flores and Anna Rene Moore on October 1, 2020, in Carole
Sawusch, et al. v. Anthony David Flores and Anna Rene Moore, et al.,
Los Angeles Superior Court Case 18SMCV00134; (e) the term of
probation or supervised release imposed by the Court, provided it is
within the statutory maximum; and (f) any of the following conditions
of probation or supervised release imposed by the Court: the
conditions set forth in Second Amended General Order 20-04 of this
Court; the drug testing conditions mandated by 18 U.S.C.
§§ 3563(a)(5) and 3583(d); and the alcohol and drug use conditions
authorized by 18 U.S.C. § 3563(b)(7).

29.   Defendant also gives up any right to bring a post-
conviction collateral attack on the convictions or sentence,
including any order of restitution, except a post-conviction
collateral attack based on a claim of ineffective assistance of
counsel, a claim of newly discovered evidence, or an explicitly

retroactive change in the applicable Sentencing Guidelines, sentencing statutes, or statutes of conviction. Defendant understands that this waiver includes, but is not limited to, arguments that the statutes to which defendant is pleading guilty are unconstitutional, and any and all claims that the statement of facts provided herein is insufficient to support defendant's pleas of guilty.

30. This agreement does not affect in any way the right of the USAO to appeal the sentence imposed by the Court.

<u>RESULT OF WITHDRAWAL OF GUILTY PLEA</u>

31. Defendant agrees that if, after entering guilty pleas pursuant to this agreement, defendant seeks to withdraw and succeeds in withdrawing defendant's guilty pleas on any basis other than a claim and finding that entry into this plea agreement was involuntary, then (a) the USAO will be relieved of all of its obligations under this agreement; and (b) should the USAO choose to pursue any charge or any civil, administrative, or regulatory action that was either dismissed or not filed as a result of this agreement, then (i) any applicable statute of limitations will be tolled between the date of defendant's signing of this agreement and the filing commencing any such action; and (ii) defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

<u>RESULT OF VACATUR, REVERSAL OR SET-ASIDE</u>

32. Defendant agrees that if any count of conviction is vacated, reversed, or set aside, the USAO may: (a) ask the Court to

34

1  resentence defendant on any remaining counts of conviction, with both

2  the USAO and defendant being released from any stipulations regarding

3  sentencing contained in this agreement, (b) ask the Court to void the

4  entire plea agreement and vacate defendant's guilty pleas on any

5  remaining counts of conviction, with both the USAO and defendant

6  being released from all their obligations under this agreement, or

7  (c) leave defendant's remaining convictions, sentence, and plea

8  agreement intact.  Defendant agrees that the choice among these three

9  options rests in the exclusive discretion of the USAO.

10                      EFFECTIVE DATE OF AGREEMENT

11       33.  This agreement is effective upon signature and execution of

12  all required certifications by defendant, defendant's counsel, and an

13  Assistant United States Attorney.

14                         BREACH OF AGREEMENT

15       34.  Defendant agrees that if defendant, at any time after the

16  signature of this agreement and execution of all required

17  certifications by defendant, defendant's counsel, and an Assistant

18  United States Attorney, knowingly violates or fails to perform any of

19  defendant's obligations under this agreement ("a breach"), the USAO

20  may declare this agreement breached.  All of defendant's obligations

21  are material, a single breach of this agreement is sufficient for the

22  USAO to declare a breach, and defendant shall not be deemed to have

23  cured a breach without the express agreement of the USAO in writing.

24  If the USAO declares this agreement breached, and the Court finds

25  such a breach to have occurred, then: (a) if defendant has previously

26  entered guilty pleas pursuant to this agreement, defendant will not

27  be able to withdraw the guilty pleas, and (b) the USAO will be

28  relieved of all its obligations under this agreement.

35.   Following the Court's finding of a knowing breach of this agreement by defendant, should the USAO choose to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a.   Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the filing commencing any such action.

b.   Defendant waives and gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such action, except to the extent that such defenses existed as of the date of defendant's signing this agreement.

c.   Defendant agrees that: (i) any statements made by defendant, under oath, at the guilty plea hearing (if such a hearing occurred prior to the breach); (ii) the agreed to factual basis statement in this agreement; and (iii) any evidence derived from such statements, shall be admissible against defendant in any such action against defendant, and defendant waives and gives up any claim under the United States Constitution, any statute, Rule 410 of the Federal Rules of Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure, or any other federal rule, that the statements or any evidence derived from the statements should be suppressed or are inadmissible.

<u>COURT AND UNITED STATES PROBATION AND PRETRIAL SERVICES</u>

<u>OFFICE NOT PARTIES</u>

36.   Defendant understands that the Court and the United States Probation and Pretrial Services Office are not parties to this agreement and need not accept any of the USAO's sentencing

recommendations or the parties' agreements to facts or sentencing factors.

37. Defendant understands that both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation and Pretrial Services Office and the Court, (b) correct any and all factual misstatements relating to the Court's Sentencing Guidelines calculations and determination of sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations and the sentence it chooses to impose are not error, although each party agrees to maintain its view that the calculations in paragraph 23 are consistent with the facts of this case.  While this paragraph permits both the USAO and defendant to submit full and complete factual information to the United States Probation and Pretrial Services Office and the Court, even if that factual information may be viewed as inconsistent with the facts agreed to in this agreement, this paragraph does not affect defendant's and the USAO's obligations not to contest the facts agreed to in this agreement.

38. Defendant understands that even if the Court ignores any sentencing recommendation, finds facts or reaches conclusions different from those agreed to, and/or imposes any sentence up to the maximum established by statute, defendant cannot, for that reason, withdraw defendant's guilty pleas, and defendant will remain bound to fulfill all defendant's obligations under this agreement.  Defendant understands that no one -- not the prosecutor, defendant's attorney, or the Court -- can make a binding prediction or promise regarding the sentence defendant will receive, except that it will be within the statutory maximum.

1
<u>NO ADDITIONAL AGREEMENTS</u>

2      39.   Defendant understands that, except as set forth herein,

3  there are no promises, understandings, or agreements between the USAO

4  and defendant or defendant's attorney, and that no additional

5  promise, understanding, or agreement may be entered into unless in a

6  writing signed by all parties or on the record in court.

7      <u>PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING</u>

8      40.   The parties agree that this agreement will be considered

9  part of the record of defendant's guilty plea hearing as if the

10 entire agreement had been read into the record of the proceeding.

11 AGREED AND ACCEPTED

12 UNITED STATES ATTORNEY'S OFFICE
   FOR THE CENTRAL DISTRICT OF
13 CALIFORNIA

14
   E. MARTIN ESTRADA
15 United States Attorney

16

17 _____          October 10, 2023
   ANDREW M. ROACH                          _____
18 Assistant United States Attorney         Date

19
   _____
20 ANTHONY DAVID FLORES                     10/10/23
   Defendant                                _____
21                                          Date

22
   _____         10/10/23
23 AMBROSIO E. RODRIGUEZ                     _____
24 Attorney for Defendant                   Date
   ANTHONY DAVID FLORES
25

26

27

28

                                    38

<u>CERTIFICATION OF DEFENDANT</u>

I have read this agreement in its entirety. I have had enough time to review and consider this agreement, and I have carefully and thoroughly discussed every part of it with my attorney. I understand the terms of this agreement, and I voluntarily agree to those terms. I have discussed the evidence with my attorney, and my attorney has advised me of my rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. No promises, inducements, or representations of any kind have been made to me other than those contained in this agreement. No one has threatened or forced me in any way to enter into this agreement. I am satisfied with the representation of my attorney in this matter, and I am pleading guilty because I am guilty of the charges and wish to take advantage of the promises set forth in this agreement, and not for any other reason.

_____     _____
ANTHONY DAVID FLORES                  Date
Defendant

39

<u>CERTIFICATION OF DEFENDANT'S ATTORNEY</u>

I am Anthony David Flores's attorney.  I have carefully and thoroughly discussed every part of this agreement with my client. Further, I have fully advised my client of his rights, of possible pretrial motions that might be filed, of possible defenses that might be asserted either prior to or at trial, of the sentencing factors set forth in 18 U.S.C. § 3553(a), of relevant Sentencing Guidelines provisions, and of the consequences of entering into this agreement. To my knowledge: no promises, inducements, or representations of any kind have been made to my client other than those contained in this agreement; no one has threatened or forced my client in any way to enter into this agreement; my client's decision to enter into this agreement is an informed and voluntary one; and the factual basis set forth in this agreement is sufficient to support my client's entry of guilty pleas pursuant to this agreement.


_____          10/10/23
AMBROSIO E. RODRIGUEZ                        Date
Attorney for Defendant
ANTHONY DAVID FLORES

40