1  E. MARTIN ESTRADA
   United States Attorney
2  CAMERON L. SCHROEDER
   Assistant United States Attorney
3  Chief, National Security Division
   ANDREW M. ROACH (Cal. Bar No. 293375)
4  Assistant United States Attorney
   Cyber & Intellectual Property Crimes Section
5       1500 United States Courthouse
        312 North Spring Street
6       Los Angeles, California 90012
        Telephone: (213) 894-0306
7       Facsimile: (213) 894-2927
        E-mail:    andrew.roach@usdoj.gov
8
   Attorneys for Plaintiff
9  UNITED STATES OF AMERICA

10              UNITED STATES DISTRICT COURT

11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12  UNITED STATES OF AMERICA,        No. 2:22-CR-00593-PA-1

13          Plaintiff,               GOVERNMENT'S OBJECTIONS TO THE
                                     PRESENTENCE REPORT AND SENTENCING
14          v.                       POSITION FOR DEFENDANT ANTHONY
                                     DAVID FLORES
15  ANTHONY DAVID FLORES,
      aka "Anton David,"             [*Filed Concurrently with Under
16                                   Seal Victim Impact Statement and
            Defendant.               Government Exhibits*]
17
                                     Hearing Date: June 17, 2024
18                                   Hearing Time: 1:30 p.m.
                                     Location:     Courtroom of the
19                                                 Hon. Percy Anderson

20

21       Plaintiff United States of America, by and through its counsel

22  of record, the United States Attorney for the Central District of

23  California and Assistant United States Attorney Andrew M. Roach,

24  hereby files its Objections to the Presentence Report and Sentencing

25  Position for Defendant Anthony David Flores.

26  //

27  //

28  //

This sentencing position is based upon the attached memorandum of points and authorities, the files and records in this case, and such further evidence and argument as the Court may permit.

Dated: June 3, 2024                    Respectfully submitted,

                                       E. MARTIN ESTRADA
                                       United States Attorney

                                       CAMERON L. SCHROEDER
                                       Assistant United States Attorney
                                       Chief, National Security Division


                                        */s/ Andrew M. Roach*
                                       ANDREW M. ROACH
                                       Assistant United States Attorney

                                       Attorneys for Plaintiff
                                       UNITED STATES OF AMERICA

**TABLE OF CONTENTS**

DESCRIPTION                                                          PAGE

TABLE OF AUTHORITIES..............................................iii

MEMORANDUM OF POINTS AND AUTHORITIES................................1

I.    INTRODUCTION..................................................1

II.   FACTUAL BASIS................................................1

      A.   Defendants Meet the Victim..............................1

      B.   Defendant Flores Secured Powers of Attorney from
           Victim.................................................3

      C.   Defendant Flores Accesses the Victim's Wealth with the
           PoAs...................................................4

      D.   Defendants' Time with the Victim........................6

      E.   Financial Transfers Before the Victim's Death...........8

      F.   Defendants' Departure from the Beach House and
           Victim's Death........................................10

      G.   Defendant's Actions After the Victim's Death...........12

      H.   The Litigation Over the Victim's Estate................13

      I.   Defendants' Violation of Court Orders..................15

      J.   The Creditor's Claims Against the Victim's Estate.......16

III.  THE PRESENTENCE REPORT AND GUIDELINES CALCULATION...........18

      A.   The PSR's Guideline Calculations.......................18

      B.   Government's Objections to the PSR.....................19

      C.   Government's Proposed Guidelines Calculation...........20

      D.   Government's Proposed Offense
           Characteristics/Adjustments...........................22

           1.   The Agreed-Upon +18 Loss Enhancement is
                Conservative.....................................22

           2.   Defendant's Conduct Involved the Conscious or
                Reckless Risk of Death...........................23

           3.   Defendant Abused a Position of Trust.............26

i

**TABLE OF CONTENTS (CONTINUED)**

DESCRIPTION                                                          PAGE

        4.   Defendant Obstructed Justice in the Civil Action....28

        5.   Defendant Flores Was an Organizer and Leader........31

IV.  VICTIM IMPACT OF DEFENDANT FLORES'S OFFENSES.................32

V.   GOVERNMENT'S RECOMMENDED SENTENCE............................32

    A.   The Seriousness of Offense...............................32

    B.   Defendant's History and Characteristics..................36

    C.   Need for Just Punishment, Adequate Deterrence, and
       Promote Respect for the Law..............................37

    D.   Need to Avoid Unwarranted Sentencing Disparity..........38

    E.   Recommended Term of Supervised Release..................39

    F.   Restitution..............................................40

VI.  CONCLUSION...................................................41

**TABLE OF AUTHORITIES**

DESCRIPTION                                                                    PAGE

Cases

United States v. Arellanes-Portillo,
  34 F.4th 1132 (10th Cir. 2022) .................................. 19

United States v. Capps,
  977 F.3d 250 (3d Cir. 2020) .................................... 19

United States v. Goff,
  501 F.3d 250 (3d Cir. 2007) .................................... 37

United States v. Henderson,
  893 F.3d 1338 (11th Cir. 2018) ................................. 23

United States v. Johansson,
  249 F.3d 848 (9th Cir. 2001) ............................... 23, 26

United States v. Maestas,
  642 F.3d 1315 (10th Cir. 2011) ................................. 26

United States v. Mares,
  402 F.3d 511 (5th Cir. 2005) ................................... 38

United States v. W. Coast Aluminum Heat Treating Co.,
  265 F.3d 986 (9th Cir. 2001) ............................... 23, 25

Statutes

18 U.S.C. § 3553(a) ......................................... 1, 32

18 U.S.C. § 3771(a)(4) ......................................... 32

Rules

U.S.S.G. § 2A1.4 ............................................... 25

U.S.S.G. § 2B1.1 ........................................... 22, 38

U.S.S.G. § 2B1.1(a)(1) ......................................... 20

U.S.S.G. § 2B1.1(b)(1)(J) .................................. 21, 22

U.S.S.G. § 2B1.1(b)(9)(c) .................................. 18, 20

U.S.S.G. § 2B1.1(b)(16)(A) ..................................... 20

U.S.S.G. § 2B3.3(b)(1)(J) .................................. 18, 20

## TABLE OF AUTHORITIES (CONTINUED)

DESCRIPTION                                                                    PAGE

U.S.S.G. § 2S1.1(a)(1)...............................................18

U.S.S.G. § 2S1.1(b)(2)(B)............................................18

U.S.S.G. § 3A1.1(b).................................................21

U.S.S.G. § 3A1.1(b)(1)..............................................18

U.S.S.G. § 3B1.1(c).................................................21

U.S.S.G. § 3B1.3................................................21, 26

U.S.S.G. § 3C1.1...........................................21, 28, 30

U.S.S.G. § 5K1.1....................................................38

U.S.S.G. § 5K2.1....................................................26

U.S.S.G. § 2B1.1(b)(13).............................................26

U.S.S.G. § 2S1.1........................................19, 20, 28, 30

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.    INTRODUCTION

3       Defendant Anthony David Flores, aka "Anton David," orchestrated

4   a fraud against a wealthy physician-investor and his $60-million

5   estate.  The victim was suffering a severe mental health crisis when

6   he met defendant Flores and his long-term romantic partner and

7   codefendant Anna Rene Moore by chance in June 2017.  Eleven months

8   later, the victim was dead and millions of dollars had been siphoned

9   from his accounts.

10       In essence, there were two schemes against the victim, the first

11  scheme to defraud him during his life, and the second scheme to

12  defraud his estate after his death.  Defendant Flores was behind the

13  entire fraud.  And after the victim's death, the mastermind of the

14  scheme against the victim's estate, the second scheme which defendant

15  Moore joined in with him.

16       Defendant Flores's crimes were serious and shocking.  And they

17  left a gifted but vulnerable victim dead.  Accordingly, for the

18  reasons below, the government recommends defendant be sentenced to

19  180 months' imprisonment (15 years), followed by three years of

20  supervised release, and a special assessment of $900.  This

21  recommendation is sufficient, but not greater than necessary, to

22  achieve the factors of 18 U.S.C. § 3553(a).

23  ## II.   FACTUAL BASIS[1]

24       ### A.    Defendants Meet the Victim

25       Before meeting the victim on June 23, 2017, defendant Flores and

26  his codefendant and then-romantic partner Anna Rene Moore lived in

27  _____

28       [1] Unless otherwise noted, these facts are drawn from the
defendant Flores's plea agreement.  (Dkt. 81.)

Fresno, California, where they operated a window cleaning business and yoga studio.  The victim, on the other hand, was a wealthy ophthalmologist and investor, with a history of mental illness and was diagnosed with bipolar disorder.[2]  The victim had recently been released from the hospital after several involuntary psychiatric hospitalizations.

Defendants first met the victim by chance, at a Los Angeles-area ice cream shop on June 23, 2017, while defendants were visiting Los Angeles from Fresno.  Within moments of their initial encounter, defendants began staying with the victim at the victim's beachfront home in Malibu, California (the "Beach House").

Within weeks of defendants first meeting the victim, the victim was arrested and hospitalized after he engaged in erratic and manic behavior in early July 2017.  Defendants visited the victim in the hospital and assisted with his discharge from the hospital. Defendants continued to live with the victim until around July 20, 2017, when the victim evicted defendants from the Beach House during another manic episode.  Afterwards, defendants returned to Fresno. Defendant Flores later sent a letter to the victim's elderly mother in Florida requesting payment for providing care to the victim. (Ex. 2 (8/11/17 Ltr. to victim's mother).)[3]

Between July 20 and July 30, 2017, the victim was alone and was arrested on three separate occasions for bizarre behavior.  Due to

---

[2] Bipolar disorder causes extreme mood swings that include emotional highs (mania or hypomania) and lows (depression).  Manic episodes may include symptoms such as high energy, reduced need for sleep, and loss of touch with reality.  Depressive episodes may include symptoms such as low energy, low motivation, and loss of interest in daily activities.

[3] All exhibit references are to the government's exhibits filed under seal.

his diminished mental capacity and multiple arrests, the victim was detained at Twin Towers Correctional Facility from approximately July 30, 2017 to September 17, 2017, where he spent most of his time in the forensic in-patient program.  While in custody, the victim was declared incompetent to stand trial on his pending criminal charges.

The victim's elderly mother in Florida was initially unable to locate the victim while he was in custody.  She contacted defendant Flores, whom she learned was a new friend and caregiver of the victim, and she requested that defendant Flores help locate her son. Defendants then traveled from Fresno to Los Angeles to help locate the victim.  By mid-August 2017, the victim's mother and defendant Flores learned that the victim was in custody.  Between mid-August 2017 and September 1, 2017, the victim's mother had several discussions with others, including defendant Flores, about placing her son in a conservatorship.

**B.   Defendant Flores Secured Powers of Attorney from Victim**

In early September 2017, the victim -- who was still in custody -- called defendant Flores and requested that defendant Flores bail the victim out of jail.  During recorded jail calls, defendant Flores told the victim that the victim's mother was attempting to get a power of attorney or conservatorship over the victim, and that defendant Flores was fighting to stop her.  In later calls, defendant Flores told the victim that his mother had hired a conservatorship attorney and wanted to take control of the Beach House to rent it out and use the funds for the victim's care.  Defendant Flores told the victim that he knew that was not what the victim wanted, because, as defendant Flores stated in the recorded jail calls, the victim had previously "made that very clear to me [defendant Flores] that nobody

3

1   is to have the beach house except the Johns Hopkins Institute."
2   (Ex. 16 (9/6/17 Jail call) at 8:10-20/10:29.)

3        While in custody, the victim signed two powers of attorney
4   granting defendant Flores power over the victim's finances.
5   Defendant Flores told the victim on the recorded jail calls that it
6   would be a "very limited" power of attorney and only used to manage
7   the victim's affairs while he was in custody and then post bail.
8   Defendant Flores told the victim that he was "welcome" to "get rid"
9   of it as soon as the victim was released from custody.  (Ex. 17
10  (9/18/17 Jail call) at 14:45-15:30/24:11.)  Defendant Flores stated
11  that he loved the victim and wanted him to be happy and healthy,
12  adding that he had no interest in the victim's money.

13       The victim executed two powers of attorneys granting defendant
14  Flores access to the victim's finances, on September 9 and 12, 2017.
15  (Exs. 3, 4 (9/9/17 and 9/12/17 Powers of Attorneys.)  The day after
16  the first power of attorney was signed, defendant Flores texted a
17  friend the following, "PS . . . I got Power of attorney for the beach
18  house."  His friend responded: "Boom."  (Ex. 5 (9/10/17 Def. Flores's
19  Text Messages) at 6.)  Defendant Flores then used these powers of
20  attorney to bail the victim out of jail.  The victim was released
21  from custody on September 17, 2017.

22       **C.   Defendant Flores Accesses the Victim's Wealth with the PoAs**
23       After the victim's release from custody, defendant Flores
24  exercised significant control over the victim's life.  Defendant
25  Flores used the powers of attorneys to access the victim's financial
26  accounts.  Between September 27, 2017 and November 9, 2017, defendant
27  Flores opened three different power-of-attorney bank accounts in the
28  victim's name with defendant Flores listed as an authorized user and

4

power of attorney on each account (the "PoA Accounts").  One of the PoA Accounts, the Chase account ending in 4782 (the "PoA Account"), served as the defendants' and victim's primary joint bank account during defendants' time with the victim.

While defendant Flores was opening these PoA Accounts, the victim began a series of extensive ketamine infusion treatments for treatment of his depression.  The ketamine treatments were prescribed by a licensed physician at a local ketamine clinic.  Defendant Flores facilitated these treatments and took the victim to and from the clinic for the victim's infusions.  The victim received his first series of ketamine infusions on October 4, 6, 10, 11, and 13, 2017.

In mid-October 2017, defendant Flores also assisted the victim with multiple financial transactions.  For example, on October 13, 2017, defendant Flores assisted the victim in cashing out the victim's long-held permanent life insurance policy for the cash surrender value of $446,872.23.  Defendant Flores helped fill out the forms and signed the form as a witness to the victim's signature. That money was later deposited into the PoA Account, where it was spent in a matter of months.  That same day, October 13, 2017, defendant Flores called Interactive Brokers and attempted to withdraw $1 million from the victim's $60-million stock portfolio account. During the recorded call, defendant Flores identified himself as the victim's "personal assistant" and "power of attorney," and he then briefly placed the victim on the call, who confirmed he needed "spending money."  This transfer did not go through, and a smaller $50,000 transfer was later made from the Interactive Brokers account to the PoA Account.

Defendant Flores had access to all the funds in the PoA Accounts, including through a debit card connected to the main PoA Account.  Defendant Flores would use the main PoA Account to pay for all the victim's expenses, including food, medical care, and taxes, in addition to paying for both his and defendant Moore's own personal expenses.  Defendants Flores and Moore also used funds from the PoA account to hire over a dozen assistants and other staff, whom defendants Flores and Moore would have work on various projects for both the victim and themselves, including defendant Flores's nascent public relations company called 3rd Star Creative, and defendants' window cleaning business and yoga studio.  Defendants hired many of these assistants to purportedly work for 3rd Star Creative, which defendant Flores was trying to develop into a brand during his time with the victim.  All these assistants, however, were paid for with the victim's funds.  Defendant Flores would represent to others, including the assistants and defendant Moore, that the victim approved of his use of the victim's funds for things such as this, because the victim had purportedly become an "investor" in all of defendant Flores's ventures.

**D.   Defendants' Time with the Victim**

Defendants lived fulltime with the victim at the Beach House following the victim's release from custody on September 17, 2017, until two days before the victim's death on May 27, 2018.  During his time at the Beach House, defendant Flores continued to hold himself out as the victim's power of attorney, guardian, caretaker, friend, and confidante.  In this role, defendant Flores exercised great control over the victim's life, including managing his financial affairs, managing the Beach House, managing the dozen or so staff and

6

assistants that worked for defendants and the victim, arranging the
victim's medical appointments, managing his medications, and hiring
various attorneys for the victim's ongoing criminal cases and a
separate medical board investigation, among other tasks.  Defendant
Flores also interacted with the victim's only family members,
including the victim's elderly mother and the victim's few long-time
friends and neighbors.

As part of his control over the victim, defendant Flores would
control what information was relayed to the victim and who could
communicate with the victim.  Defendant Flores also withheld
information from the victim.  He instructed assistants and the
victim's treating physicians to not discuss or raise financial issues
with the victim.  Defendant Flores also directed the household
assistants to frequently check the victim's mail and remove all legal
and financial documents from the victim's incoming mail.

For the bulk of the time that defendants lived with the victim,
between October 2017 and early May 2018, the victim was predominantly
in a depressed state.  He spent most of his time at the Beach House,
getting hours of massages, which defendants arranged for him each and
every day.  The victim also consumed both prescribed and unprescribed
drugs, which defendants —- primarily defendant Flores —- either
facilitated the victim in receiving or directly provided.

The victim received approximately 43 prescribed ketamine
infusions between October 2017 and his death in May 2018.  The
ketamine infusions were provided by a licensed physician for the
treatment of the victim's depression.  When the treating ketamine
physician expressed alarm at the frequency of the victim's infusions,
defendant Flores specifically requested that they continue and told

7

the physician that the victim wanted to maintain the frequency, as it was the only thing that brought him joy.  The treating ketamine physician separately spoke with the victim, who confirmed he wanted to continue with the treatments.  Defendant Flores also provided the victim with other drugs, including marijuana and psilocybin mushrooms, which were consumed between and in conjunction with the victim's prescribed ketamine treatments, and which were unbeknown to the victim's treating physicians.

Within approximately six months of living together, by late March 2018, defendants had spent approximately $600,000 of the victim's funds, depleting the cash balance in the PoA Account.[4]  In response, defendant Flores prepared a two-page written request for an additional $1 million from the victim.  (Ex. 6 (Def. Flores April 2018 $1M Cash Infusion Request).)  The victim agreed to this request and helped initiate a transfer of $1 million from his Interactive Brokers account to the PoA Account.  The transfer was problematic and took multiple attempts and several days to clear.  The transfer finally went through and was deposited into the PoA Account on April 5, 2018.  Through this, defendant Flores learned how to successfully conduct a wire transfer from the victim's Interactive Brokers account.

**E.   Financial Transfers Before the Victim's Death**

Approximately two weeks before the victim's death, on May 13, 2018, defendants Flores and Moore took lysergic acid diethylamide ("LSD") with the victim at the victim's request.  The victim believed

---

[4] The initial amount in the PoA Account was funded from the surrender of the victim's life insurance policy, a $100,000 transfer from victim's Fidelity account, and a $50,000 transfer from victim's Interactive Brokers account.

that it would help his depression.  After the initial LSD experience, defendant Flores continued to administer LSD to the victim, giving the victim LSD on multiple occasions within the final two weeks of the victim's life.

The victim entered a manic state following the ingestion of LSD. Massage therapists and assistants in the Beach House observed the victim act markedly different during this time.  The victim became increasingly erratic and difficult to be around.  Defendant Flores also reported to the victim's physician that he was worried that the victim's mania might be returning.  (Ex. 7 (5/21/18 Physician notes documenting defendant Flores's concern that "mania may be returning")).

Given the victim's severe mood swings and instability, defendant Flores became fearful that the victim would evict him and defendant Moore from the Beach House, as the victim had done the previous summer, and cut off defendant Flores's access to the PoA Account and the victim's money.  This would have severely impacted defendants' lifestyle as well as their business and other ventures, which were all now heavily reliant upon the victim's wealth to operate.

Accordingly, hours after the victim took LSD on another occasion, defendant Flores initiated two $1-million transfers from the victim's Interactive Brokers account to the PoA Account on the evening of May 23, 2018.  These transfers were made without the victim's knowledge, consent, or approval; and unlike the prior transfer in April, there was no genuine reason for the transfer when the PoA Accounts still had an available balance of approximately $700,000 given the recent cash infusion.

Within minutes of the transfers, defendant Flores directed a male assistant to call Interactive Brokers and impersonate the victim to check on the status of the wire transfers.  Defendant Flores directed the male assistant to ensure that defendant Flores's cell phone number and an email address that defendant Flores controlled were listed on the account, so that the victim would not receive notifications of the pending wire transfers.

The following day, on May 24, 2018, the first $1 million wire transfer initiated the day before was deposited into the PoA Account. Within minutes of the $1 million deposit, defendant Flores caused the money to be transferred to his personal bank account.

That same day, the victim received his final ketamine infusion. According to medical reports, the victim appeared to be manic and "behaved very oddly compared to how he normally is," and the ketamine infusion was terminated early.

In sum, between May 23, 2018 and through May 24, 2018, defendant Flores caused three transfers, totaling $1,676,179.32, from the PoA Accounts to bank accounts in defendant Flores's name only.

**F.   Defendants' Leave the Beach House and Victim's Death**

On May 25, 2018, defendants Flores and Moore departed the Beach House.  Defendant Flores would later tell the police that the victim "ordered" him to leave the Beach House.  (Ex. 8 (5/28/18 LASD Report) at 4.)  The victim was in a manic state at the time they departed. The victim was pacing around the Beach House, refusing to make eye contact with others, twitching his head, and occasionally talking to himself or laughing randomly, all consistent with a manic episode.

Defendants relocated to a hotel in Santa Monica, California, where they rented a room using the victim's funds.  The victim

1   remained at the Beach House under the supervision of assistants and

2   massage therapists.  Defendant Flores had access to video cameras in

3   the Beach House and monitored the victim's worsening condition over

4   the next two days.  He routinely provided instructions to those at

5   the Beach House on what to do and how to respond to the victim's

6   manic episode.

7          The victim died at the Beach House on May 27, 2018, at the age

8   of 57 years old.  The coroner determined the victim's death was an

9   accident and caused by the combination of ketamine and ethanol

10  intoxication.  A second, private autopsy determined the cause of

11  death to be the result of a dilated cardiomyopathy and a congenitally

12  narrow right coronary artery.  Blood toxicology reports from the

13  second autopsy revealed "therapeutic levels of ketamine and a small

14  amount of ethanol," which it determined "did not significantly

15  contribute to the immediate cause of death."[5]

16         The final moments of the victim's life were captured on cameras

17  installed inside the Beach House.  (See Ex. 19 (5/27/18 Beach House

18  video).)  The victim's final moments are at odds with the obituary

19  that defendant Flores later posted in the local newspaper that

20  described victim dying "peacefully" and "doing what he loved doing

21  most, watching wildlife from his seaside balcony and listening to the

22  waves of the Pacific Ocean."  (Ex. 9 (Def. Flores's email with

23  obituary text; Palisadian-Post Obituary).)

24

25

26

27

─────────────

28      [5] Neither autopsies had the benefit of events leading up to the
    victim's death and the circumstances of his death, including the LSD
    and other drug use.

1

### G.   Defendant's Actions After the Victim's Death

2    After the victim's death on May 27, 2018, defendant Flores and

3 defendant Moore conspired to defraud the victim's estate, through

4 resisting efforts from the victim's estate to recover funds

5 misappropriated from the victim, and later through the filing of

6 false creditor's claims against the victim's estate.

7    The day after the victim's death, defendant Flores had a private

8 phone call with his mother, during which they discussed what should

9 be said about the victim's death and how to leverage the situation.

10 Defendant Flores took notes during this call, and he texted defendant

11 Moore the following notes from the call, "Good friend under difficult

12 circumstances . . . We bonded and he trusted me . . . With a

13 promise that I be promised a monetary amount he said take care of the

14 [h]ouse and I want to you 20million."  Defendant Flores then

15 conferenced defendant Moore into the call with defendant Flores and

16 his mother.  Defendant Flores's mother expressed concern that

17 defendant Flores would be held criminally responsible for the

18 victim's death, and she told defendant Moore that they were counting

19 on her to ensure that defendant Flores was not held responsible.

20    That same day, May 28, 2018, defendant Flores immediately hired

21 an attorney, paying with the victim's funds.  Defendant Flores used

22 this attorney, and other attorneys he later retained, to help him

23 devise ways to keep the fraudulently obtained funds that he caused to

24 be deposited into his account.  Defendant Flores, however, failed to

25 provide this attorney with the full and complete facts of his

26 relationship with the victim, the source of the funds, or the

27 circumstances of the transfers that made their way into defendant

28

Flores's personal accounts, including the victim's LSD use at the time of the transfers, among others.

Defendants returned to live at the Beach House after the victim's death.  On the evening of May 28, 2018, defendant Flores, defendant Moore, and an assistant were reviewing the victim's financial accounts at the request of defendants' recently hired attorney.  At a certain point, the assistant informed defendant Flores that the assistant had logged into the victim's Interactive Brokers account and saw that one of two $1-million transfers initiated from the victim's Interactive Brokers account to the PoA Account on May 23, 2018 was still pending and required further approval.  Defendant Flores instructed the assistant to approve the pending $1-million wire transfer, which the assistant did at defendant Flores's direction.

After instructing the assistant to approve the transfer, defendant Flores looked at both the assistant and defendant Moore and told them words to the effect of that they "weren't here" and that they did not witness this transaction.  Defendant Flores later told defendant Moore that no one would question the second transfer that he caused, because it would appear as if this transfer was initiated by the victim on May 23, 2018, and that it just took a few days to process.  Defendant Flores later caused the transfer of this $1 million into his personal accounts.

**H.   The Litigation Over the Victim's Estate**

Defendants continued to live at the Beach House for several weeks following the victim's death until the victim's family threatened legal action if defendants refused to leave.

1        Around late June and July 2018, the victim's family learned of
2   the transfers made to defendant Flores's accounts immediately before
3   and after the victim's death.  Before that time, the victim's family
4   had no knowledge of the victim's true wealth.  Defendant Flores was
5   aware of this fact, and he had previously made statements to the
6   victim's mother suggesting that the victim was destitute.[6]  After
7   learning of the transfers, the victim's family filed a probate
8   petition against defendants, alleging claims of fraud, elder abuse,
9   and conversion, to invalidate the transfers.

10       Later, on October 30, 2018, the victim's family filed a separate
11  civil lawsuit in Los Angeles Superior Court against defendants for
12  the same relief.  Neither defendant Flores nor defendant Moore
13  disclosed the full circumstances of the two $1-million transfers
14  during the subsequent civil litigation over the victim's estate.
15  Rather, both defendants Flores and Moore provided false and
16  misleading information about transfers.

17       The complaint filed in the civil litigation on October 30, 2018,
18  alleged that, "On May 29, 2018 (two days after [the victim's] death),
19  [defendant Flores] made a $1 million disbursement from [the victim's]
20  investment account to a bank account held in [the victim's] and
21  [defendant Flores's] name."  On April 4, 2019, defendant Flores
22  signed a verified answer under the penalty of perjury which denied
23  that allegation and stated, "The $1,000,000 transfer was initiated by
24  [the victim] before his passing and took several days to clear."

25

26  _____

27       [6] Indeed, before the victim's death, defendant Flores suggested
    that the victim's financial situation was so dire to the victim's
    mother that the mother routinely sent defendant Flores's information
28  about the bankruptcy and other potential solutions to help her son,
    whom she was led to believe was disabled and essentially penniless.

14

Defendant Flores made similar statements in sworn written discovery responses.  Defendant Flores knew these statements were false and misleading when he made them, as he had initiated the transfers before the victim's death without the victim's knowledge, and he released the pending transfer on the evening of May 28, 2018, after the victim's death.

Defendants transferred funds originating from the victim's Interactive Brokerage account, including the two $1-million transfers that defendant Flores caused to be transferred, to multiple accounts in their separate and joint names.  All these transactions involved funds that originated from the victim's accounts.  Defendant Flores participated in these transfers knowing that the money transferred was from his unauthorized transfer of two $1-million wires from the victim's Interactive Brokers account.

## I.   Defendants' Violation of Court Orders

In the summer and fall of 2018, the victim's estate attempted to recover the funds taken from victim's accounts.  In the civil lawsuit against defendants, the victim's estate sought judicial orders to compel defendants to return the victim's funds.  But this lawsuit did not stop the defendants, and they violated court orders in the civil action ordering them to return the victim's funds to the victim's estate.

On November 9, 2018, the court in the civil action appointed a receiver and issued a temporary restraining order ("TRO") enjoining defendants from transferring, concealing, retaining, or dissipating any funds from the victim's accounts, and it further ordered defendants to return all funds from the victim's accounts to the receiver immediately.  Defendants Flores and Moore were served with

these orders on November 13, 2018 and November 17, 2018.  Defendants were fully aware of the TRO no later than November 15, 2018, after a Vanguard account representative told them that their account had been frozen due to a legal hold during a recorded phone call.

Despite the TRO, defendants did not surrender the funds to the receiver as required.  Rather, defendants attempted to wire funds to new accounts and make multiple cash withdrawals.  Just hours after Vanguard informed defendants that their account was frozen, and notwithstanding the TRO, defendants Flores and Moore visited multiple bank branches and attempted to withdraw money from their accounts during the afternoon of November 15, 2018.  Defendants ultimately made two $10,000 withdrawals from their Citibank accounts on November 15, 2018.  The same day, defendants later made a wire payment of $100,000 in funds originating from the victim's accounts to attorneys they retained to represent them in civil litigation, all in violation of the TRO.

In a further attempt to obstruct the TRO, defendants Flores and Moore traveled to South Dakota on January 10, 2019, to open new bank accounts at First Premier Bank under a new corporate entity. Defendants opened these bank accounts to cash $30,000 in checks from funds originating from the victim's accounts, which they were previously ordered to return to the receiver, as required by the TRO.

**J.   The Creditor's Claims Against the Victim's Estate**

In late 2018 and early 2019, as the receiver recovered the victim's funds on behalf of the estate, defendant Flores devised a scheme to defraud the victim's estate.  Specifically, the scheme attempted to (1) justify defendants' retention of the approximate $2.7 million that defendant Flores had transferred from the victim's

accounts immediately before and after the victim's death; and
(2) defraud the victim's estate of even more money.

Over many months, defendant Flores devised this scheme as he
continually altered defendants' explanations for why defendants were
purportedly entitled to retain the money transferred to them before
and after the victim's death, and why defendants should receive more
money from the victim's estate.  The explanations for why defendants
were purportedly entitled to money from the victim's estate evolved
over the course of many months, and they discussed filing various
claims against the victim's estate, including wage and hour claims,
sexual harassment, and other claims.  Defendant Flores also coached
defendant Moore as to what they should say in the civil litigation.
Defendant Flores's claims to funds from the estate were premised on
an ever-changing series of justifications, including: (1) claims
based on the effect of the power of attorney; (2) various fabricated
pending business deals between defendants Flores and Moore and
victim; and (3) claims that the victim "promised" defendants Flores
and Moore an inheritance of one-third of the victim's estate and the
Beach House and was on the verge of changing his will before he died.

In furtherance of defendants' scheme to defraud the victim's
estate, defendants Flores and Moore caused the mailing of four false
creditor's claims, two by each of them, against the victim's estate
on January 16, 2019, claiming that the victim had jointly promised
them an inheritance of one-third of the victim's $60-million estate
and the Beach House.  (Exs. 10, 11 (Def. Flores's creditor claims).)
The creditor's claims contained a list of purported dates of these
purported promises, with the descriptions of some bordering on
absurdity.  See id. at 4-8.

Both defendants were involved in the drafting of the creditor's claims, however, defendant Flores took primary responsibility for devising the dates of such purported promises and instructed defendant Moore what to write.  Defendant Flores told defendant Moore that such statements must be included to make their claims viable, even though he knew them not to be true.  Defendant Flores represented under the penalty of perjury that his statements in the claims were "true and correct," but defendant Flores knew them to be false and misleading.  Defendant Flores made them nonetheless as part of his scheme to defraud the victim's estate.

After extensive litigation with the victim's estate, defendants Flores and Moore entered into a settlement agreement with the estate. As part of the settlement agreement, defendants agreed to a non-dischargeable, joint and severally liable judgment of $1,000,000 against them in favor of the victim's estate.  Defendants Flores and Moore also agreed to withdraw their creditor's claims against the estate, which they did on July 17, 2019 -- approximately six months after defendants first filed the creditor's claims.

**III. THE PRESENTENCE REPORT AND GUIDELINES CALCULATION**

    **A.    The PSR's Guideline Calculations**

The probation officer calculated the guidelines by grouping the offenses into two different groups: the Fraud Group and the Money Laundering Group.  (PSR ¶¶ 83-88.)  The probation officer then calculated the offense level by considering the offense level for the Money Laundering Group, and calculated the offense level as follows (PSR ¶¶ 89-105):

| Money Laundering Group | | |
|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2S1.1(a)(1), § 2B1.1(a)(1) |
| Specific Offense Characteristics: | | |
|    - Loss amount between $3.5 and $9.5 million | +18 | U.S.S.G. § 2B3.3(b)(1)(J) |
|    - Violation of court order | +2 | U.S.S.G. § 2B1.1(b)(9)(c) |
|    - § 1956 Conviction | +2 | U.S.S.G. § 2S1.1(b)(2)(B) |
| Victim Enhancement: | | |
|    - Vulnerable Victim Enhancement | +2 | U.S.S.G. § 3A1.1(b)(1) |
| Acceptance of Responsibility: | -3 | U.S.S.G. § 3E1.1(a), (b) |
| **Total Offense Level** | **28** | |

Defendant Flores has zero criminal history points and is in Criminal History Category I.  With total offense level of 28 and Criminal History Category of I, the probation office calculates defendant Flores's resulting sentencing guidelines are 78 to 97 months' imprisonment.

### B.  Government's Objections to the PSR

By considering only the Money Laundering Group, the PSR's calculation fails to apply certain offense-related adjustments applicable to defendant Flores's fraud conduct, namely, the four additional adjustments the government seeks below for (1) the conscious or reckless disregard or risk of death, (2) abuse of position of trust, (3) obstruction of justice, and (4) an aggravating role.  This is because the commentary to § 2S1.1 limits Chapter 3 Adjustments to only those related to "the offense covered by this guideline (i.e., the laundering of criminally derived funds) and not

on the underlying offense from which the laundered funds were derived." U.S.S.G. § 2S1.1, Application Note 2(C); United States v. Capps, 977 F.3d 250, 255 (3d Cir. 2020); Id. at 257 n.7 (collecting cases); United States v. Arellanes-Portillo, 34 F.4th 1132 (10th Cir. 2022). This causes the PSR to omit multiple Chapter 3 enhancements that apply to defendant Flores's conduct.

To accurately calculate defendant Flores's guidelines, the PSR should calculate the guidelines for both the Fraud and Money Laundering Group separately and then choose the higher of the two. See Capps, 977 F.3d at 255, 257 (adopting approach for calculation of mail fraud and money laundering counts and stating "[t]he PSR did not calculate the mail fraud guidelines range, though it should have"); U.S.S.G. § 3D1.2(d) and Application Note 6; U.S.S.G. § 3D1.3 and Application Note 3.

For these reasons, the government objects to the PSR's use of the guidelines for the Money Laundering Group and its failure to calculate the guidelines for the Fraud Group to determine defendant Flores's guidelines calculation.

**C.   Government's Proposed Guidelines Calculation**

Defendant Flores's Fraud Group convictions permit the application of additional Chapter 3 Adjustments. The application of these four additional adjustments -- (1) conscious or reckless disregard of death; (2) abuse of a position of trust; (3) obstruction of justice in the civil proceeding; and (4) aggravating role for manager or supervisor of others -- in addition to the vulnerable victim enhancement, results in a higher offense level than the Money Laundering Group. It therefore is the appropriate offense level to

1  determine defendant Flores's guidelines here.  See U.S.S.G. § 2S1.1,

2  Application Note 6; U.S.S.G. § 3D1.3(a).

3      The government submits that the correct guidelines calculation

4  is based on the Fraud Group as shown below:

| Fraud Group | | |
|---|---|---|
| Base Offense Level: | 7 | U.S.S.G. § 2B1.1(a)(1) |
| Specific Offense Characteristics: | | |
| - Loss amount between $3.5 and $9.5 million | +18 | U.S.S.G. § 2B3.3(b)(1)(J) |
| - Violation of court order | +2 | U.S.S.G. § 2B1.1(b)(9)(c) |
| - Conscious or reckless risk of death | +2 | U.S.S.G. § 2B1.1(b)(16)(A) |
| Adjustments: | | |
| - Vulnerable Victim Enhancement | +2 | U.S.S.G. § 3A1.1(b) |
| - Abuse of Position of Trust | +2 | U.S.S.G. § 3B1.3 |
| - Obstruction of Justice | +2 | U.S.S.G. § 3C1.1 |
| - Aggravating Role for Leader of Manager | +2 | U.S.S.G. § 3B1.1(c) |
| Acceptance of Responsibility: | -3 | U.S.S.G. § 3E1.1(a), (b) |
| **Total Offense Level** | **34** | |

22    Defendant Flores has zero criminal history points and is in

23  Criminal History Category I.  With total offense level of 34 and

24  Criminal History Category of I, defendant Flores's resulting

25  sentencing guidelines are 151 to 188 months' imprisonment.

### D.   Government's Proposed Offense Characteristics/Adjustments

#### 1.   The Agreed-Upon +18 Loss Enhancement is Conservative

The parties agreed to a +18 enhancement in the plea agreement for a loss amount between $3.5 million and $9.5 million under U.S.S.G. § 2B1.1(b)(1)(J).  This is a conservative loss amount reflecting a compromise between the actual loss of approximately $3.1 million and the intended loss of $20 million.

The actual loss attributable to defendant's conduct is $3,128,856.46.  This is the amount that the receiver in the civil action determined that defendant Flores and Moore misappropriated from the victim and his estate.  (PSR ¶ 80.)  The receiver ultimately recovered $2,089,448.82 in victim's funds from defendants, leaving the remaining $1,039,407.64 that was spent or diverted.[7]  The amount the receiver recovered, however, is not credited against defendants' actual loss because it was not voluntarily returned to the victim's estate "before the offense was detected."  U.S.S.G. § 2B1.1, Application Note 3(E)(i).  Accordingly, the actual loss amount of $3,128,856.46 would trigger the +16 enhancement for a loss amount between $1.5 million and $3.5 million under § 2B1.1(b)(1)(I).

The intended loss attributable to defendant's conduct is approximately $20 million.  This stems from defendant Flores's false claim after the victim's death that he and defendant Moore were promised one-third of the victim's $60-million estate and the Beach House, which exceeds $20 million in total.  (PSR ¶ 89.)  Accordingly, the intended loss amount of approximately $20 million would trigger

---

[7] The number in the PSR has a typo in the first digit and states that "[t]he receiver recovered $1,089,448.82." PSR ¶ 82.  The first digit should be a 2.

the +20 enhancement for a loss amount between $9.5 million and $25 million under § 2B1.1(b)(1)(K).

In light of the difference between the two loss amounts and recognizing that defendant Flores withdrew his false claims, although only after the victim's estate spent millions of dollars in litigation, the government concurs with the probation office's decision to use the +18 enhancement for a loss amount between $3.5 million and $9.5 million under U.S.S.G. § 2B1.1(b)(1)(J).

### 2.   Defendant's Conduct Involved the Conscious or Reckless Risk of Death

Defendant Flores's conduct during the final days and hours of the victim's life involved the conscious or reckless risk of death. The enhancement applies even if there is no injury or harm, see United States v. W. Coast Aluminum Heat Treating Co., 265 F.3d 986, 993 (9th Cir. 2001).  Here, of course, there was harm as the victim ultimately died from defendant's grossly reckless conduct.

To establish that a defendant's conduct warrants the application of § 2B.1(b)(16)(A), the government "need not show actual injury to any particular victim" and must instead focus on a defendant's "disregard of risk."  United States v. Henderson, 893 F.3d 1338, 1351–52 (11th Cir. 2018).  Ignorance of the risk is not a defense to the enhancement.  United States v. Johansson, 249 F.3d 848, 859 (9th Cir. 2001) ("[A] defendant does not have to subjectively know that his conduct created the risk.").

There can be little doubt that defendant Flores created a situation that involved the reckless risk of death during the final days of the victim's life.  Defendant Flores specifically gave the victim LSD on multiple occasions, while the victim was in a downward

23

manic spiral.  The LSD had a significant effect on the victim.  And the victim got much worse.

Defendant Flores failed to heed any warning as the victim's condition severely deteriorated.  Defendant Moore warned defendant Flores via text message in the early morning hours on May 23, 2018 -- just four days before the victim's death -- that the LSD was causing the victim to stay up all night, texting defendant Flores that the victim "was up until 5am last night.  As we know when he does acid, he doesn't sleep. . . Maybe we can cut back on the tr[i]pping [LSD] because it seems to exacerbate."  See Ex. 12 at USAO_8457.[8]  But defendant Flores disregarded this warning, and told defendant Moore that he thought it was helping the victim.

Later that day, May 23, 2018, defendant Flores initiated a change in the two-factor authentication feature of the victim's Interactive Brokerage account and then he initiated the two $1-million transfers from the victim's account to the PoA account.

Defendant Flores's disregard of the situation continued further on May 24, 2018.  Defendant Flores helped facilitated the victim's final ketamine infusion.  Defendant Flores never disclosed the victim's repeated LSD use in the recent days despite his self-proclaimed status as the victim's guardian, caregiver, manager, and power of attorney.

By May 24, 2018, the victim was in clear mental distress.  A surreptitiously recorded video found on defendant's Google account from May 24, 2018 captures the victim's current state.  In that

---

[8] According to the Diagnostic and Statistical Manual of Mental Disorders-5, sleep is essential to the treatment of bipolar disorder and the decreased need for sleep heralds the onset of a manic episode.

video, the victim, in a clearly distressed or inebriated voice, is mumbling and saying he "feel[s] better than he ever has." <u>See</u> Ex. 18 at 3:00-3:34 (5/24/18 video).  Defendant's response is "take it slow . . . enjoy yourself."  The victim then mumbles that he is "born again, born again."

Defendant Flores's recklessness continued over the last two days for the victim's life.  After the victim kicked defendant out of the Beach House in a manic state on May 25, defendant Flores -- who held himself out as the victim's guardian and caregiver -- watched the final two days of the victim's life through cameras inside the Beach House.  Defendant Flores had access to these cameras and watched the victim severely decompensate over a matter of hours.  The final hour of the victim's life shows him acting erratically.  <u>See</u> Ex. 19 (5/29/18 Beach House Video) at 19:00-30:00/58:50.  But defendant Flores watched this video, as he admits, and did not seek medical attention, even when others in the home raised their concerns to him via text message.  And the victim ultimately died.

The probation office declined to add this enhancement because "it cannot be conclusively determined that LSD had caused or contributed to the victim's death."  (PSR ¶ 89(d).)  But the probation office is looking at only a portion of defendant Flores's conduct, only focusing on his administering LSD to victim.  This is too narrow.  The appropriate inquiry is to look at the totality of the circumstances and the "creation of risk," not whether the conduct actually inflicted injury or "even if the ultimate probability of [injury] is found to be relatively low."  <u>W. Coast Aluminum</u>, 265 F.3d at 993.  Moreover, the probation officer both overlooks the reckless risks that defendant Flores created, and more importantly, it

1 overlooks defendant's unique position of trust, duty, and

2 responsibility vis-à-vis the victim, serving as his caregiver,

3 guardian, and power of attorney.

4     Looking at the totality of risks shows that defendant Flores

5 created a highly unstable and reckless situation.  <u>See</u> U.S.S.G.

6 § 2A1.4, Application Note 1 (defining "reckless" to include a "gross

7 deviation from the standard of care that a reasonable person would

8 exercise in such situation").  A reasonable person would recognize

9 that this was risky situation.  In fact, even the massage therapist

10 still at the home raised her concerns and she sent defendant Flores

11 texted and called him approximately seven times that day.  (<u>See</u> Exs.

12 13 (5/27/18 Text Messages) and 14 (Def. Flores's phone records).)  It

13 is of no consequence if defendant Flores subjectively (and

14 erroneously) viewed the risk as minimal.  <u>See</u> <u>United States v.</u>

15 <u>Johansson</u>, 249 F.3d 848, 859 (9th Cir. 2001) (government does not

16 have to prove that the defendant was actually aware of the risk of

17 serious bodily injury or death when seeking a § 2B1.1(b)(13)

18 enhancement); <u>United States v. Maestas</u>, 642 F.3d 1315, 1321 (10th

19 Cir. 2011).  This risk was still present and the victim died.

20 Accordingly, this enhancement applies.[9]

21        3.   <u>Defendant Abused a Position of Trust</u>

22     Defendant Flores also abused a position of private trust

23 triggering the § 3B1.3 enhancement.  That enhancement states, "If the

24 defendant abused a position of public or private trust . . . in a

25

26

---

27     [9] In the alternative, if the Court declines to apply this
enhancement, an upward variance is still appropriate because of the

28 victim's death.  <u>See</u> U.S.S.G. § 5K2.1 ("If death resulted, the court
may increase the sentence above the authorized guideline range.").

1 manner that significantly facilitated the commission or concealment

2 of the offense, increase by 2 levels."  U.S.S.G. § 3B1.3.

3   Here, defendant Flores assumed a position of trust with the

4 victim.  He secured two powers of attorney from the victim, which he

5 then used to his benefit to later defraud the victim.  These powers

6 of attorney specifically stated that defendant Flores was "assum[ing]

7 the fiduciary and other legal responsibilities of an agent," and that

8 he had a legal duty to "keep the principal's property separate and

9 distinct" and "not transfer the principal's property to [himself]

10 without full and adequate consideration or accept a gift."  (Ex. 3

11 (PoA) at 4.)  Defendant Flores, of course, violated these

12 restrictions and breached the duties of his position of trust.

13   But defendant Flores abused more than the power he derived from

14 the powers of attorney.  Defendant Flores also abused the personal

15 trust that the victim had placed in him.  Defendant Flores assumed

16 the role of caregiver and confidante of the victim, among other

17 roles.  Defendant Flores isolated the victim from his family and few

18 longtime friends and he fostered the victim's alienation from them.

19 Indeed, none of the victim's family or close friends ever really

20 spoke to the victim after his release from custody in September 2017,

21 because defendant Flores prevented that communication and had assumed

22 significant control over the victim.  By assuming this position of

23 trust, defendant Flores ultimately got access to the victim's immense

24 wealth, which he used to defraud the victim.  But by assuming this

25 position of trust, defendant Flores assumed a special duty to the

26 victim, one that he ultimately abused for his own benefit.  All of

27 this qualifies for the abuse-of-trust enhancement.

28

1    The probation office recognized defendant Flores's abuse of

2    trust in this case, stating "after Flores obtained powers of attorney

3    to bail the victim out of jail, he began to act as the victim's

4    caregiver and made medical and financial decisions on the victim's

5    life, and continued to access the victim's funds to fund his

6    lifestyle and his business projects, and exercised much control over

7    the victim's life, [and] he was able to transfer the victim's funds

8    into his personal account immediately before and after the victim's

9    death."  (PSR ¶ 100.)[10]  Despite this, the probation office declined

10   to apply the enhancement because defendant Flores's money laundering

11   was not necessarily based on his position of trust, relying on

12   Application Note 2(C) to U.S.S.G. § 2S1.1.  (PSR ¶¶ 99, 100.)  This

13   position fails to recognize that defendant's abuse of trust applies

14   to the Fraud Group counts, and results in a higher offense level when

15   added to the other enhancements.  Accordingly, this enhancement

16   should be applied.

17          4.   Defendant Obstructed Justice in the Civil Action

18   Defendant Flores obstructed and impeded the administration of

19   justice during the civil litigation over the victim's estate.  He

20   repeatedly attempted to obstruct justice during that litigation in

21   order to conceal his crimes and to defraud the victim's estate.  In

22   doing so, he repeatedly lied under oath during depositions and sworn

23   written responses regarding the true events surrounding the financial

24   transfers around the victim's death, the victim's drug use (which

25   defendant Flores facilitated), his role in all of this, and many

26

27   _____

28       [10] Defendant Moore did not hold the same level of trust with the
     victim nor was did she have the power of attorney.  (PSR ¶ 100.)

28

other items.  This is sufficient to trigger the § 3C1.1 obstruction enhancement.

Defendant Flores, for example, denied having any knowledge of the victim taking LSD in his second deposition on August 22, 2019. (Ex. 15 at 29.)  In his deposition the following day, defendant continued to disavow all knowledge of the LSD at first, but then he reversed course mid-way through his deposition and started to admit giving the victim LSD, as follows:

> Q.   You mentioned the last time that we spoke that you
>      don't know whether [victim] ever used LSD around you.
>      Do you recall that?
>
> A.   I do.
>
> Q.   Do you stand by that statement?
>
> A.   I do.
>
>      . . .
>
> Q.   How many times did you drop acid with [victim]?
>
> A.   None.
>
> Q.   The first time you dropped acid with [victim] was
>      Mother's Day of 2018.  Do you remember that?
>
> A.   I do.
>
> Q.   Tell me about that day.
>
> A.   We gathered.  We had food.  We ingested a substance
>      which I cannot discern is LSD, and we enjoyed our day
>      together, watching the sunset and talking and being
>      around the bush or being around the beach.
>
>      . . .
>
> Q.   Did you ever yourself help dose some LSD out for
>      [victim]?
>
> A.   I did.

(Ex. 15 at 63, 65, 68.)

Defendant Flores gave misleading testimony regarding the millions of dollars that he transferred out of the victim's accounts to his personal accounts as well.  In his second deposition, defendant Flores testified that the "[victim] initiated the transfer[s]" of the two $1-million wires before the victim's death, which the victim supposedly made while under the influence of LSD and in a manic state.  (Id. at 40-41.)  But two months later, defendant Flores testified that "[w]e were instructed to initiate the transfers."  (Id. at 74.)  Defendant Flores now admits both were lies.

Defendant Flores also gave false sworn written answers during the civil litigation to conceal the transfers that he now admits were unauthorized.  For example, defendant lied in his verified answer, again claiming that the two $1-million transfers before and after the victim's death were made or authorized by the victim.  This of course was false as defendant Flores now concedes.  See supra at II.H.

The reasons for defendant's perjury was clear: defendant knew that no one would believe he was lawfully entitled to the $2.7 million that he transferred to himself in the hours before and after the victim's death if he disclosed the truth, i.e., that he made the transfers without the victim's knowledge, while the victim was under the influence of LSD and other drugs, and in a manic state.  He knew that he if told the truth he would be required to return the stolen funds and be subject to criminal prosecution.  So he lied.  And in doing so, he obstructed the administration of justice.  See U.S.S.G. § 3C1.1, Application Note 4(B) (obstruction of justice includes "committing, suborning, or attempting to suborn perjury, including

during the course of a civil proceeding if such perjury pertains to conduct that forms the basis of the offense of conviction").

Defendant Flores continued his obstruction of justice throughout the civil proceedings. This conduct forced the victim's family to spend millions of dollars in legal fees to expose these lies. All this is deserving of the obstruction enhancement.

### 5. Defendant Flores Was an Organizer and Leader

Finally, a +2 enhancement under § 3B1.1(c) applies for defendant Flores's aggravating role in the fraud. Defendant Flores was the instigator and ringleader of the entire fraud. See PSR ¶ 97. During the victim's life, defendant Flores was the one who got the powers of attorney, developed a position of trust over the victim, fostered the victim's alienation with the victim's family members and few friends, fostered a culture of near daily drug use and hours of massages for the victim, administered LSD to the victim, and transferred money from the victim's account to defendant Flores's personal account.[11]

After the victim's death, defendant Flores devised a plan to falsely claim that the victim made a "promise" that defendant Flores and Moore were entitled to one-third of the victim's estate and the Beach House. This culminated in the filing of the false creditor's claims against the estate. As part of this scheme, defendant Flores created a false narrative that the victim had promised them a third

---

[11] Defendant Flores instructed a male assistant to impersonate victim day after victim's death to approve of pending $1 million transfer. (See PSR ¶ 97.) But this assistant is not a criminally responsible co-participant because he thought the transfers were authorized and that defendant Flores had the authority to tell him to impersonate the victim, because defendant Flores had instructed the assistant to do so on prior occasions and told him he was authorized to do so to alleviate the administrative burden of these tasks for the victim.

of his estate and the Beach House on numerous purported occasions.
And he directed defendant Moore to draft a claim with dates and the
information that he provided.  Information that defendant Flores knew
to be false.  Defendant Flores later coached defendant Moore as to
what to say during the civil litigation to conceal his criminal
actions, including defendant Flores's transfer of funds, the drug
use, and all of his suspicious conduct.

Because defendant Flores organized this part of the scheme and
directed defendant Moore in it, and because she is a criminal
responsible co-participant, a +2 enhancement under § 3B1.1(c) applies
to defendant Flores.

## IV.  VICTIM IMPACT OF DEFENDANT FLORES'S OFFENSES

The government is filing a Victim Impact Statement from the
victim's family under seal for the Court's consideration.  (Ex. 1
(Victim Impact Statement).)  A representative of the victim's family
will appear at sentencing to address the Court, as permitted under
the Crime Victims' Rights Act.  See 18 U.S.C. § 3771(a)(4),
(e)(2)(B).

## V.   GOVERNMENT'S RECOMMENDED SENTENCE

The government recommends defendant be sentenced to 180 months'
imprisonment (15 years), followed by three years of supervised
release, and a special assessment of $900.  This recommendation is
sufficient, but not greater than necessary, to achieve the factors of
18 U.S.C. § 3553(a).

### A.   The Seriousness of Offense

The seriousness of defendant's offense calls for a serious 15-
year sentence.  Defendant Flores orchestrated a fraud against the

victim and his estate over the course of years, causing millions of dollars in losses.

While alive, defendant Flores took control of the victim's life and finances through the powers of attorney and his cultivation of a position of trust with the victim.  After bailing the victim out of jail, defendant Flores fostered the vulnerable victim's dependence on him, while alienating him from others.  Indeed, defendant Flores misled the victim's family and few friends about what was going on in the Beach House, all while his undue influence over the victim grew.

Defendant Flores gained his influence over the victim during the victim's life by withholding information from the victim and fostering the then-depressed victim into a state of complacency, through hours of massages each day and chemical dependency through frequent use of ketamine injections, marijuana, and other later drugs.  Defendant Flores then isolated the victim from his family and friends.  Defendant Flores capitalized on the victim's anger at his friends' and family's decision to not immediately bail him out of jail, which they delayed in doing so in order to put together a comprehensive medical plan to treat the victim.  He used the victim's anger to alienate him from his family and few friends.  These family members and friends tried their best to intervene in the victim's life, with conservatorship attorneys and contacting the victim.  But defendant Flores erected roadblocks which prevented them from reaching the victim, preventing them from saving the victim.

Once he established a position of trust over the victim and got access to the victim's finances, defendant Flores then abused that relationship for his own private gain, including using the victim's resources for a host of other personal ventures that had no

legitimate connection or benefit to the victim.  The victim
essentially became defendant Flores's personal slush fund.

Defendant Flores kept this scheme afloat for many months.  He
even got the victim to transfer $1 million into the PoA Account in
April 2018, after preparing a business proposal to request the victim
replenish the PoA Account.  All this came crashing down in May 2018,
when the victim's mania returned.  Witnesses reported that the
victim's initial LSD trips seemed to help him, but the additional LSD
quickly made the situation much worse, and the victim went into a
mental tailspin.  The victim's mania jeopardized the multiple
ventures that defendant Flores had created with the victim's wealth.
It risked everything that defendant Flores had created with the
victim's money.  And defendant Flores feared that the victim would go
manic and evict him and defendant Moore (and cut off their access to
his funds), just as the victim had done the prior summer.

But after tasting the good life for a bit and enjoying his
newfound success, all of which was paid for with the victim's money,
defendant Flores decided to take matters into his own hands and
create an insurance policy.  Days before the victim died, defendant
Flores initiated the two $1-million transfers from the victim's
accounts, without the victim's knowledge or consent, to give him a
financial lifeline to support his ventures in case the victim evicted
defendant Flores from the Beach House (which did happen) and cut off
his financial access.  Defendant Flores did this likely believing
that if the victim went into a manic tailspin, the victim would be
arrested or hospitalized again and that he could come to the rescue.

Sadly, however, due to the multiple reckless risks that
defendant Flores created in order to keep the victim complacent and

34

his grift afloat, the victim died.  Tragically and alone.  At 57
years old.

    Rather than be candid about the events of the victim's death and
accept even a modicum of responsibility for his role in it, defendant
Flores then tried to profit off the victim's death.  He lied about
his involvement and how the victim died.  Then, believing that he was
entitled to something, he devised a variety of false means and
pretenses to try to justify the money he had siphoned from the
victim's accounts, and then he came up with an even bolder claim --
one of a fake promise that he would inherit a third of the estate --
in an attempt to defraud over $20 million from the victim's estate.

    In recommending this sentence, the government readily
acknowledges that defendant Flores likely never intended to
physically harm the victim.  On the contrary, defendant Flores
provided care to the victim and likely wanted him to get better (and
the victim did improve at some point as evidenced by his restoration
of competency in his criminal matters).  The government does not
contest this.  It made little sense for defendant Flores to want any
harm to befall his newfound benefactor, as the victim had become
defendant Flores's golden goose.  But human beings are complex and a
person can hold both altruistic and nefarious criminal motives
simultaneously.  And like any caregiver scheme, a defendant can both
provide care, even good care, while simultaneously taking advantage
of their dependent victim.  Both can be true.  And that is what
happened here.

    It is no defense that defendant Flores did not intend the
victim's death either.  Just as saying "I didn't mean to harm him" is
no defense to a drug dealer who distributed the fatal dose to their

customer, the same is true here.  That defendant Flores didn't mean to cause the victim's death is somewhat mitigating, but it still demands accountability.  To the extent defendant Flores claims it was a tragedy (and he should not and cannot), it was a tragedy entirely of defendant Flores's own making.  And the victim paid the price.

Most troubling about the events is defendant Flores's attempted coverup.  Throughout it all, defendant Flores lied, concealed the truth, and obstructed justice.  This required the victim's family to spend over $5 million in legal fees to contest defendant Flores's actions in various legal proceedings, including in the probate case, the civil action, and defendant Flores's later attempt to discharge his $1 million judgment in bankruptcy.  See Victim Impact Statement, Att. #2.  All of this conduct is serious and it demands a strong sentence.

## B.  Defendant's History and Characteristics

Defendant's history and characteristics demand this sentence as well.  This crime was largely one fueled by defendant Flores's greed, vanity, and narcissism.  As defendant Flores exercised more and more control over the victim's life, he became emboldened.  He began to think that he knew better than the victim's doctors and other medical professionals, by virtue of failure to disclose the victim's true drug use, and he was unwilling to listen to anyone that questioned his authority.  He even brushed off suggestions from codefendant Moore that they should stop giving the victim LSD, suggestions that if defendant Flores heeded may have resulted in a very different outcome.  The victim may still be alive.

It also must be noted that defendant Flores was the driving force behind all of this.  He was the instigator of this crime and he

dragged defendant Moore into this situation along with him.  And there is no doubt that this crime would have never occurred if not for defendant Flores's grandiose view of self and narcissism.  The recommended sentence will hopefully force defendant Flores to come to terms with this and learn from his mistakes and flaws.

Defendant, in mitigation, has no criminal history.  Defendant reports other obstacles in his life, but the government takes no position on them (or their veracity), as they simply do not excuse his prolonged fraudulent conduct in this case or the fact that the victim died.  There is no excuse or mitigation for stealing from a vulnerable victim like the victim in this case.  And there is no excuse for attempting to defraud the victim's heartbroken family after his death.  Defendant must face the punishment for his crimes.

**C.   Need for Just Punishment, Adequate Deterrence, and Promote Respect for the Law**

A 15-year sentence is also necessary for the other § 3553(a) factors.  This sentence reflects the seriousness of the crime, a multi-million-dollar fraud that undoubtedly contributed to the untimely death of a brilliant but ill physician.  Such a sentence provides just punishment, as defendant will likely be incarcerated through his 60th birthday, which is just three years older than the age of the victim when he tragically died at 57 years old.

This sentence will also provide adequate deterrence.  It will send a message to others that caregiver fraud schemes targeting elderly and vulnerable victims are significant crimes and will face significant sentences.  This is particularly important, as this scheme is all too common with today's aging population.  Sadly, the government has received numerous reports of similar frauds involving

1  similarly vulnerable victims since this case went public.  There are

2  other victims out there and other fraudsters doing similar schemes.

3  A message must be sent to society.  Potential abusers must know that

4  they will get caught and punished.

5       Finally, the sentence will afford defendant Flores the

6  opportunity to learn from his criminal lapses in judgment.

7  Defendant's time in prison will force him to recognize his errors and

8  have respect for the law and the legal process.

9       **D.   Need to Avoid Unwarranted Sentencing Disparity**

10      Finally, § 3553(a)(6) requires the Court to impose a sentence to

11  avoid unwarranted sentence disparities among defendants with similar

12  records who have been found guilty of similar conduct.  United States

13  v. Goff, 501 F.3d 250, 258 (3d Cir. 2007) ("Part of 'just punishment'

14  is the avoidance of unwarranted sentencing disparities").  A sentence

15  within the guidelines range is usually the best way to avoid

16  sentencing disparities.  See United States v. Mares, 402 F.3d 511,

17  518-19 (5th Cir. 2005).

18      The government recommends a guidelines sentence here because it

19  is the best way to avoid unwarranted sentencing disparity.  According

20  to the U.S. Sentencing Commission's Judiciary Sentencing

21  Information,[12] the average and median length of imprisonment for

22  defendants at this offense level (34) and guideline (U.S.S.G.

23  § 2B1.1) is approximately 120 and 121 months, respectively.  The

24  government is mindful that this data also shows that approximately

25  25% of defendants in this selected cell on the sentencing chart

26

27  _____

28       [12] This feature of the U.S. Sentencing Commission is available
    online at https://jsin.ussc.gov/ and is designed to help judges
    determine sentences for similarly situated defendants.

1   received a guideline sentence, while 42% received a downward

2   departure or variance, and the remaining received upward departures

3   or credit under U.S.S.G. § 5K1.1.  While most defendants get

4   variances, the government is not recommending one here because the

5   government was also conservative in its calculation of the guidelines

6   and did not include the higher intended loss amount.  See supra

7   III.D.1.  In addition, the government's agreement to drop the § 1028A

8   count that would have added another consecutive two years to

9   defendant's sentence cuts against any variance.

10          Lastly, the government notes that a defendant in the Central

11  District of California received a 20-year sentence for a caregiver

12  scheme.  See United States v. Caroline Joanne Herrling, Case No.

13  2:23-CR-59-MEMF (C.D. Cal.); see West Hills Woman Who Disposed of One

14  Victim's Body Sentenced to 20 Years in Federal Prison for Stealing

15  Identities, Homes and Assets.  That defendant's conduct was more

16  egregious than defendant Flores's here, and included defendant's

17  disposal of the victim's body, identity theft, other victims, and

18  potential other crimes.  The government does not recommend that

19  sentence here because defendant Flores was not as callous.

20  Therefore, there is no unwarranted sentencing disparity between these

21  two defendants.

22          **E.   Recommended Term of Supervised Release**

23          The government recommends a three-year term of supervised

24  release.  Such a term is necessary to ensure defendant Flores remains

25  law-abiding and begins to pay restitution to the victim's estate.  In

26  addition, as a term of supervised release, the government requests

27  that the Court impose a condition prohibiting defendant Flores from

28  contacting the victim's family either directly or through third

1  parties.  Such condition is reasonably related to adequate deterrence
2  and protection of the public and the victim's family.

3     **F.   Restitution**

4     Defendants Flores and Moore agreed to a stipulated, non-
5  dischargeable $1,000,000 judgment against them in the civil action.
6  See Los Angeles Superior Court Case 18SMCV00134.  Notwithstanding his
7  agreement that the amount would be non-dischargeable in bankruptcy,
8  defendant Flores later attempted to discharge this debt in
9  bankruptcy.  See In re Bankruptcy of Anthony David Flores, Case No.
10  21-01036 (E.D. Cal.).  The victim's estate was forced to expend even
11  more legal fees to litigate defendant Flores's attempt to discharge
12  this debt.

13     Therefore, the government requests that the Court order
14  restitution in the amount of $1,000,000 to be jointly and severally
15  liable with defendant Moore, provided it includes offset for any
16  payments made on the $1,000,000 stipulated judgment against
17  defendants Anthony David Flores and Anna Rene Moore in Los Angeles
18  Superior Court Case 18SMCV00134.  See PSR ¶ 166.  This will ensure
19  that defendant Flores pays a significant sum of restitution, abides
20  by his legal commitments, and cannot try to escape it through the
21  misuse of the bankruptcy process.

22  //
23  //
24  //

25
26
27
28

## VI.  CONCLUSION

For the foregoing reasons, the government respectfully requests that this Court sentence defendant Flores to 180 months' imprisonment, followed by three years of supervised release (with the requested no-contact order for the victim's family), and the special assessment of $900.

Dated: June 3, 2024            Respectfully submitted,

E. MARTIN ESTRADA
United States Attorney

CAMERON L. SCHROEDER
Assistant United States Attorney
Chief, National Security Division


*/s/ Andrew M. Roach*
ANDREW M. ROACH
Assistant United States Attorney

Attorneys for Plaintiff
UNITED STATES OF AMERICA