Ambrosio E. Rodriguez, (CA Bar No. 200880)
The Rodriguez Law Group
626 Wilshire Blvd. Ste. 460
Los Angeles, CA 90017
Telephone: (213) 995-6767
Facsimile: (213) 995-6368

Attorneys for the Defendant,
ANTHONY DAVID FLORES

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                          Plaintiff,<br><br>           v.<br><br>ANTHONY DAVID FLORES<br><br>                          Defendant. | Docket No.0973 2:22CR00593-1<br><br>DEFENDANT ANTHONY DAVID FLORES' SENTENCING POSITION<br><br>Honorable Percy Anderson<br>Hearing Date: 06/17/2024<br>Hearing Time: 8:30 a.m. |

Defendant Anthony David Flores by and through his attorney of record, Ambrosio E. Rodriguez, hereby files his Sentencing Position.

This Sentencing Position is based upon the attached memorandum of points and authorities, the Presentence Report, the files and records in this case, and such further evidence and arguments as the Court may permit.

Dated: June 3, 2024

                          Respectfully submitted,


                          ___/s/ Ambrosio Rodriguez___
                          Ambrosio E. Rodriguez
                          Attorney for Anthony David Flores

1

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

On October 19, 2023, the defendant, Mr. Anthony David Flores, pled guilty to Counts 1, 3 through 5, 7, and 9 through 12 of the indictment. The details of these counts are as follows:

Count 1: Conspiracy to commit mail fraud in collaboration with Anna Rene Moore, in violation of 18 U.S.C. §§ 1349 and 1341.

Counts 3 and 4: Wire fraud, in violation of 18 U.S.C. § 1343.

Counts 5 and 7: Committing mail fraud, in violation of 18 U.S.C. § 1341.

Count 9: Conspiracy to engage in money laundering with Anna Rene Moore, in violation of 18 U.S.C. § 1956(h).

Counts 10 and 11: Conspiracy with Anna Rene Moore to commit wire and mail fraud, in violation of 18 U.S.C. §§ 1956(a)(1) and 2(b).

Count 12: Engaging in a monetary transaction in criminally derived property of a value greater than $10,000 with Anna Rene Moore, in violation of 18 U.S.C. § 1957(a).

The Defense recommends that the Court deviate from the Guideline Sentencing Range based on multiple factors. First, an analysis of the specific facts of the case, as well as the context comprehensively examined and the effects caused, will lead to the conclusion that the baseline for analyzing the severity of the crimes should be lower. Specifically, the analysis reveals that Mr. Flores initially acted with good intentions and the utmost willingness to help his friend in an adverse situation, for which he legitimately obtained a Power of Attorney strictly for the required purposes.

Additionally, Mr. Flores has no criminal history, which is a significant mitigating factor. His acceptance of responsibility, genuine remorse, and proactive pursuit of rehabilitation, along with his intention to make amends for the harm caused, should be positively regarded.

An incorrect interpretation leading to an erroneous determination of the punitive quantum would undermine the importance of remorse, rehabilitation, and reparation in the legal process, suggesting that these values are irrelevant regardless of the severity of the actions committed. Given these considerations, the Defense respectfully urges the Court to recognize these mitigating factors and impose a sentence that reflects the true nature of Mr. Flores' conduct and character, rather than adhering strictly to the Guideline Sentencing Range.

## II.  STATEMENT OF FACTS

Defendant adopts and incorporates as his statement of facts the factual basis set forth in the Plea Agreement.

## III. THE PRESENTENCE REPORT

### A.    The Government and PSR Calculations

On December 18, 2023, Mr. Flores was interviewed by the United States Probation Office ("USPO"). The USPO filed its Presentence Report based on the interview and investigation into Mr. Flores's background.

The USPO calculated a total offense level of 28 based on the following calculations:

| | |
|---|---|
| Base Offense Level: | 27 |
| Specific Offense Characteristics: | +2 |
| Victim Adjustment | +2 |

Acceptance of responsibility                    -3

Total:         28

For a statutory offense level of 27 and a criminal history category of I, the initial guideline imprisonment was 70 to 87 months in custody.[1] Subsequent adjustments of +4 for Specific Offense Characteristics and Victim Adjustment, and -3 for Acceptance of Responsibility, resulted in a final offense level of 28, and the USPO resultingly calculated a guideline sentence of 78 to 97 months incarceration. (PSR pg 4). Additionally, the guideline term of supervised release is one to three years, and a guideline fine range between $25,000 to $250,000.

**B.    Defense Calculation and Objections**

The Defense objects to the recommendations made by the USPO and the Government, asserting significant mitigating factors justify the Court's discretion to grant a downward departure of -4 from the base offense level under USSG §2B1.1(b)(1), which governs the increase of offense levels based on the Loss Table.

According to the facts of the case, Mr. Flores and Ms. Moore diverted $1,039,407.64 for their personal use. This figure corresponds to a loss amount that falls under USSG §2B1.1(b)(1)(H), necessitating a +14 level increase, in addition to the base offense level of +7, the minimum threshold that the defense does not dispute.

Finally, and as an alternative, even if considering the USPO's proposal, the maximum amount mentioned in the presentation (PSR pg 18) is estimated at $3,128,856.46, which does not exceed

---

[1] Any Guideline custody time would be elevated to at least 120 months due to a relevant Mandatory Minimum Sentence

4

the provisions of USSG §2B1.1(b)(1)(J). Therefore, a maximum of +16 should be added to the base offense level.

Given the above, the Defense proposes that the Total Base Offense Level be 23, as it should include the two-level increase for violating a specific judicial order pursuant to USSG §2B1.1(b)(9)(C).

The Defense objects to the +2 based on the Victim-Related Adjustment. Flores and the victim had an insignificant age difference, and the victim's mental state and voluntary ketamine treatments that were prescribed, administered and supermised by a medical doctor. The ketamine infusions did not make him particularly vulnerable to these crimes. According to USSG §3A1.1(b)(1), the victim was not particularly vulnerable to these offenses.

Therefore, the +2 for the Victim-Related Adjustment should be discounted since the victim was not particularly vulnerable, and the crimes were not committed by exploiting any alleged vulnerability. It is noteworthy that the USPO did not raise the victim's situation as an aggravating factor in Anna Moore's case, even though the facts occurred simultaneously and were part of the same criminal maneuvers.

Furthermore, since no Victim-Related Adjustment should apply, the Defense proposes a decrease of two levels under USSG §4C1.1 for the Zero-Point Offender Reduction. This is because, as noted in the PSR document, Flores meets all the criteria, and the only impediment to the application of the two-level decrease, which is the enhancement for vulnerable victim, has been dismissed.

5

Based on the above, the Defense's Proposed Guideline Range is the following:

| | |
|---|---|
| Base Offense Level: | 7 |
| Increasement based on losses: | **+14** |
| Violation of Judicial Order: | +2 |
| Total Base Offense Level: | **23** |
| Specific Offense Characteristics: | +2 |
| Victim Related Adjustment: | **0** |
| Acceptance of Responsibility: | -3 |
| Zero-Point Offender Reduction: | **-2** |
| **TOTAL:** | **20** |

Based on the above and the analysis that will follow, the facts of this case, the conditions surrounding it, and the specific situation of the Defendant would result in a guideline sentence range of 33-41 months.

For the reasons outlined below, it is reasonable and proportionate to adhere to the lower end of this range, along with the imposition of a one-year term of supervised release and a $25,000 fine, given Mr. Flores's current situation and the fact that he has already returned over one million dollars.

IV. **ANALYSIS OF THE § 3553(a) FACTORS, OFFENSE BACKGROUND, LOSS DISCUSION AND PERSONAL CIRCUMSTANCES**

a. **Applicable Legal Framework**

The Court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in 18 U.S.C. § 3553(a). Additionally, this mandate emanates from the constitutional principle enshrined in the Eighth Amendment, which

6

prohibits the imposition of cruel and unusual punishment understood as a sentence "grossly disproportionate" to the offense committed.

In that regard, determining the particular sentence to be imposed, the Court shall consider:

1. The nature and circumstances of the offense and the history and characteristics of the defendant;

2. The need for the sentence to be imposed –

   a. To reflect the seriousness of the offense; to promote respect for the law, and to provide just punishment for the offense;

   b. To afford adequate deterrence to criminal conduct;

   c. To protect the public from further crimes of the defendant; and

   d. To provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

3. The kinds of sentence available;

4. The guideline sentencing range;

5. Any pertinent policy statements issued by the Sentencing Commission;

6. The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

7. The need to provide restitution to any victim of the offense.

Guidelines in federal sentencing matters are advisory under *United States v. Booker*, a sentencing court "must consult those

Guidelines and take them into account when sentencing" 543 U.S. 220, 264 (2005); *United States v. Brown*, 892 F.3d 385, 399 (D.C. Cir. 2018). Besides, the Supreme Court has pointed out that while the Guidelines provide "the starting point and the initial benchmark" for sentencing, the district court should consider all the § 3553(a) factors. G*all v. United States,* 552 U.S. 38, 49–50 (2007). The Guidelines' recommended sentencing range will ordinarily "reflect a rough approximation of sentences that might achieve § 3553(a)'s objectives." *Kimbrough v. United* States, 552 U.S. 85, 108–09 (2007).

Therefore, the following sections will emphasize the need for a sentence that does not exceed three years and six months based on three central axes: the specifics of the facts of the accusation, the application of the actual loss amount, and the consideration of Mr. Flores's personal circumstances.

In that regard, the extent of the damage caused, the parties involved, the nature of the victims, and the general context are factors that Courts have considered to gauge the severity of the offense and determine a just penalty. In this sense, Courts have repeatedly affirmed downward variations based on various factors such as remorse, criminal history, potential recidivism, and other relevant considerations.

### b. Offense Background

In this case, accurately determining the extent of the damage and the surrounding circumstances is central to appropriately addressing the seriousness of the charges to which Mr. Flores has pleaded guilty. In this regard, it is pertinent to acknowledge that the tragic and unfortunate death of Dr. Mark Sawusch skews

the perspective on the events, making the reprehensible actions admitted by Mr. Flores appear even worse.

Therefore, it is crucial to consider the full context of what transpired and recognize that there was a mutual benefit sought from the friendship between Mr. Flores, Ms. Moore and Dr. Sawusch. From the account of events, it is evident that the friendship developed spontaneously and without ulterior motives. Witnesses to this friendship have reported that Mr. Sawusch invited them to live with him because he desired social acceptance and wanted to experience new activities that he had been unable to pursue due to his introverted nature. It was from this desire that Dr. Sawusch, voluntarily and without being deceived or coerced by Mr. Flores or Ms. Moore, engaged in a friendship with them.

This socializing factor was something that a billionaire doctor took advantage of, deciding to enhance the friendship quickly by inviting the defendants to live in his Malibu home and share his daily life. As Mr. Sawusch expressed on multiple occasions, he did this to experience new things he was depriving himself of due to his own limitations. Dr. Sawusch had difficulties achieving these experiences because of his introverted nature, not simply because he suffered from bipolar disorder. While this disorder causes sudden and drastic mood swings, it does not prevent a person from making certain decisions. This is evident in Dr. Sawusch's decisions to form new friendships, sever ties with others, such as his family, and manage his investment accounts, amassing $60 million before and after meeting Mr. Flores.

Dr. Sawusch's decision-making ability was so unimpaired that when he decided he did not want Flores or Moore living in his house, he asked them to leave, and they complied. However, after several months of distance during which the defendants returned to Fresno without any intention of living in Dr. Sawusch's house again, it was his family who contacted Mr. Flores and asked him to help find him after he was arrested and incarcerated at Los Angeles County Twin Towers.

Dr. Sawusch's and his mother had a complicated relationship. Her decision to not bail him out (bail was something she could afford) once he was incarcerated for misdemeanors and plan to have him placed under a conservatorship caused irreparable harm. Twin Towers jail is a brutal place, and to go from a home in Malibu with a net worth of $60 million to not being bailed out by your mother is a lot to process. Faced with this family abandonment and the absence of other supportive relationships, Mr. Flores was left as the only capable and willing person to help his friend. According to the case records, Dr. Sawusch told Anthony that he needed to arrange two Power of Attorneys to access his financial accounts to secure his release. The reason that Power of Attorneys were necessary to bail Dr. Sawush was because Mr. Flores could not bring the doctor's checkbook to Twin Towers on the weekends when friends and family are allowed to visit. Jail visitations are done through a glass partition and papers cannot be passed back and forth. In order to access funds for bail a notary has to come to the jail in order to be able to "pass papers" to an inmate so that Dr. Sawush could access his money in order to get bailed out on misdemeanors.

10

This aspect is central to understanding several points. First, Mr. Flores acted at the initial request of Mrs. Sawush and then at the will of Dr. Sawusch. Second, a legal mandate was obtained in good faith. Third, Anthony made it clear that he wanted it to be for a short, specific period and had no interest in managing his accounts. Fourth, upon regaining his freedom, Mr. Sawusch could have revoked these powers but voluntarily chose not to. There is zero evidence that upon his release was under the any psychological or chemical influence that prevented him from withdrawing from the Power of Attorney.

Regarding this last point, Mr. Sawusch was a medical expert who had attended and graduated from two of the most elite medical educational institutions in the world, the University of Chicago and Johns Hopkins University. This is relevant in understanding that Mr. Flores could never have deceived Dr. Sawusch into undergoing any particular treatment. For instance, the ketamine treatment was initiated by Dr. Sawush and the ingestion of LSD was motivated and carried out by Dr. Sawusch's own will without any intervention or undue influence from Mr. Flores. This case demonstrates that the victim, although suffering from bipolar disorder, was not limited in his decision-making abilities. Dr. Sawusch built and managed an investment accounts so successfully that it amassed more than $60 million. He also determined his own treatments and the use of certain alternative substances. Additionally, he took advantage of Mr. Flores and Ms. Moore's social skills to meet new people and have new experiences.

All these circumstances allow for a more comprehensive understanding of Dr. Sawusch's unique situation and reveal that

his relationship with Mr. Flores was mutually beneficial. As will be discussed in the section on personal matters, Mr. Flores comes from a low-income family and has worked hard all his life to ensure a basic standard of living. Undoubtedly, seeing his connection with a multi-millionaire who constantly talked about money, listened to Mr. Flores, and indulged him in various joint development projects, Mr. Flores was eventually tempted to take advantage of the situation.

It is crucial to understand the context in which Mr. Flores committed these offenses. He was dealing with an eccentric multi-millionaire doctor who had severed family ties and possibly driven away friends with his behavior, relying on Mr. Flores and Ms. Moore to experience new things. In this context, the defendants and the victim formed a symbiotic, mutually beneficial relationship in which they planned several business ventures over many months, as evidenced in the case records. These projects show Mr. Flores's clear motivation to succeed economically and pursue entrepreneurial ideas, while Dr. Sawusch played the role of the expert and successful multi-millionaire willing to embark on ventures with his friends.

Dr. Sawusch, while still managing the growth of his fortune through investment control, decided to cash in his life insurance policy to access the funds for new ventures. They developed an action plan for business projects and future care expenses. It is important to note that these care expenses were intensive, costly, and required substantial ongoing disbursements. For example, in April 2018, Dr. Sawusch requested and approved an initial transfer of $1,000,000, which was executed at his behest. Regardless of

how much Mr. Flores or Ms. Moore may have insisted, certain legal issues and security mechanisms required Dr. Sawusch's full approval.

This supports the argument that this eccentric multi-millionaire ophthalmologist was not an especially vulnerable victim whom the defendants exploited. This is evident from the freedom and control he exercised over his life, his indulgence in eccentricities and luxuries, the medical treatments he chose, his Twitter (@hockeyschtick1, with over 5,000 followers) account and his decisions about who he associated with. These circumstances disprove the notion that he was a victim in a particularly vulnerable situation, as his bipolar disorder caused sudden and impulsive mood swings but did not hinder his ability to manage his life, which he had been doing successfully. Therefore, the +2 adjustment for the Victim Related Adjustment should be discounted, as the victim was not particularly vulnerable, and the offenses were not committed by exploiting any supposed vulnerability.

Regarding the impact, it is important to distinguish who the affected parties were. Although initially, money withdrawn by Dr. Sawusch was excessively used by Mr. Flores and Ms. Moore, the fact remains that at the time of his death, approximately $700,000 of the $1,000,000 withdrawn a month earlier remained in the account. The rest had been used to ensure Dr. Sawusch's care and eccentricities.

Furthermore, at a later stage, Mr. Flores and Ms. Moore engaged in fraudulent activities, but all these actions were directed against the doctor's Estate. This is significant because the harm was inflicted on a legal entity rather than a person,

13

inherently implying lesser severity. It is crucial to differentiate between the potential harm to Dr. Sawusch and any harm to the legal entity created by law. In this case, it is clear that the most significant impact was on the Estate, which would benefit two individuals with whom the victim had severed ties previously.

Lastly, the current loss incurred by both parties amounts to $1,039,407.64. This figure is undoubtedly substantial, and the Sentencing Guidelines place it at a +14 aggravation of the base offense level. However, it must be evaluated in perspective. At no point did Mr. Flores attempt to impoverish either Dr. Sawusch or his Estate. The affected amount does not even reach 2% of the multi-millionaire ophthalmologist's total fortune.

All the circumstances and the analyzed context aim to provide a better understanding of the framework in which the actions were committed and the participants involved. This scenario is crucial to examine, as these factors must be considered when imposing a sentence to ensure a reasonable proportionality between the factual framework and the punitive quantum to be imposed. Therefore, the Victim Related Adjustment should not be applied. Consequently, pursuant to USSG §4C1.1, the offense level should be decreased by two levels based on the Zero-Point Offender Reduction since Mr. Flores meets all the requirements stipulated by that guideline. Given the particularities of the case, a sentence exceeding three years of imprisonment would appear disproportionate considering the damages caused, the affected parties, and the overall contextual analysis.

### c. Miscalculation by the USPO About the Difference Between the Actual Loss and the Intended

In addition to the points raised above, and in accordance with the terms of the Plea Agreement acknowledging the potential applicability of the +2 Specific Offense Characteristics enhancements, the defense strongly opposes the application of the +18 Offense base level enhancement based on the alleged losses. The United States Probation Office (USPO) suggests a +18 enhancement under USSG §2B1.1(b)(J) for a loss exceeding $3.5 million but not surpassing $9.5 million. However, this calculation lacks substantiation from any evidence in the case records, not even the information provided on page 18 of the Presentence Report (PSR), which states that Flores and Moore misappropriated $3,128,856.46. This figure originates from the civil lawsuit's financial analysis of the funds. Therefore, if the amount assessed by the USPO were to be considered, it would fall within the range stipulated in USSG §2B1.1(b)(I) for a loss exceeding $1.5 million but not surpassing $3.5 million, which carries a corresponding enhancement of +16.

Despite the aforementioned, it is evident from the case records that the actual loss amounts to $1,039,407.64, which was diverted for Flores and Moore's personal use. The actual loss figure falls within the range specified in USSG §2B1.1(b)(H) for a loss exceeding $550,000 but not surpassing $1,500,000, warranting a fourteen-level increase above the base offense level.

In that regard, the guidelines define "actual" and "intended" loss and suggest that the greater of either should be applied to the calculation. See USSG § 2B1.1(b)(1), cmt. 3. Here, however,

15

that amount significantly exaggerates the potential scope of this fraud. The Court is only required to make a reasonable estimate of the loss and can consider factors that it deems appropriate based on the circumstances of the case. See USSG § 2B1.1(b)(1), cmt. 3(C). Here, the Court should determine the loss based on the amount of the money that it was not possible to recover.

The court may increase the offense level for a defendant convicted of fraud based on the actual financial loss caused by the defendant's wrongful conduct or by the loss intended by the defendant, whichever is greater. Application Note 3(A) of section 2B1.1(b)(1) provides that if an intended loss can be determined and it exceeds the actual loss, the court should use the intended loss to calculate the defendant's offense level. The reason the intended loss figure is used, even if it is significantly greater than actual loss, is to measure the magnitude of the crime at the time it was committed. Nonetheless, Mr. Flores respectfully submits that any effort to punish him for an inchoate, unrealized loss is inconsistent with other, competing sections of the Guidelines. He respectfully submits that the Guidelines do not contain a workable, internally consistent definition of the term "loss," particularly when the court employs the intended loss as the measure of harm instead of the actual loss. Also, Application Note 3(E)(I) of section 2B1.1 provides that loss shall be reduced by the money returned.

Therefore, in this particular case, utilizing the actual loss as the primary metric represents the fairest and most direct approach to assessing the extent of damages incurred. Furthermore, given the existence of a judicially-calculated figure from civil

proceedings, there's no necessity for an exhaustive evidentiary review. Consequently, Mr. Flores respectfully asserts that any attempt to base his sentencing on the intended loss disproportionately emphasizes his mental state, disregarding a reasoned examination of the actual harm inflicted upon Dr. Sawusch's estate.

In terms of legal interpretation, the Supreme Court's decision in *Stinson v. United States* 508 U.S. 36 (1993), underscores the equivalency of the Guidelines to legislative rules adopted by federal agencies. The Court emphasized that accompanying commentary should be given deference unless it contradicts or diverges from the Guidelines' text, which remains paramount. *Id.* at 44-45. The Supreme Court subsequently clarified that deference to such agency interpretations should only be afforded when the legislative rule itself is truly ambiguous after "all traditional tools of construction" have been exhausted. *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019). This includes whether deference should be afforded to Section 2B1.1's commentary, as set forth in Application Note 3, providing multiple definitions to the text's term "loss" no deference should be applied to Application Note 3, as the term "loss" is unambiguous.

In that direction, in *United States v. Kirilyuk*, the Ninth Circuit expressly found that it was not bound by prior precedent interpreting Note 3(F)(i)'s 500 minimum loss requirement for credit cards, as the prior decisions did not "squarely address" the specific issue of whether this commentary conflicts with the meaning of loss in Section 2B1.1 as prohibited by Stinson. Kirilyuk, 29 F.4th 1128, 1134-35 (9th Cir. 2022). It then noted

that "loss" was not defined by Section 2B1.1, applied the basic analysis paradigm set forth in *Kisor*, found that Section 3(F)(i)'s expanded the commonly accepted definition of loss, and held that this "expansion of the meaning of "loss" is "clearly inconsistent with the language of the Guideline and is not binding under Stinson." 6 Id. at 1137-38. In so finding, the *Kirilyuk* Court emphasized "this case [which involved a loss finding that "skyrocketed" by $60,000,000 and added 22 levels to the total offense level of 43] illustrates the egregious problem with the Application Note's expansion of the meaning of 'loss'" and emphasized how the commentary improperly "operated as an enhanced punishment." Id. at 1138.

Consistent with the reasoning and analysis of the *Kirilyuk* Court, this Court should find error in Application Note 3's undue expansion of the definition of "loss" under Section 2B1.1. Under *Stinson* and *Kisor*, the only acceptable definition of "loss" under Section 2B1.1 is actual loss. See, e.g., *Kirilyuk*, 29 F.4th at 1141. Further, as it was explained, this is not a case where the loss is incalculable and it has been set by the civil judiciary.

In conclusion, based on the factual circumstances of the case, Mr. Flores and Ms. Moore diverted $1,039,407.64 for personal use. This amount aligns with a loss falling within the parameters of USSG §2B1.1(b)(1)(H), warranting a fourteen-level increase.

### d. Mr. Anthony Flores Personal Background

In the present case, the reality concerning Mr. Anthony Flores, both as an individual and as a defendant, is that his actions were unlawful and morally wrong, for which he has taken

18

responsibility and deeply regrets. It's crucial to note that despite his involvement in various businesses and associations and his interactions with affluent individuals, he had never before taken money that was not rightfully his. In fact, he was at his home in Fresno when contacted by Mrs. Sawush with a clear plea for assistance: find her son.

In this regard, it is evident that, given the specifics of the circumstances, the defendant's current age, his remorse, and his determination to lead a law-abiding life, the risk of recidivism is extremely low. Concerning Mr. Flores' personal situation, certain objective factors are correlated with the risk of reoffending. Indeed, this risk consistently declines with age, with the presence of family ties, in non-violent offenders, and when the individual suffers from health issues. All of these factors are present in Anthony's case, underscoring that, if granted freedom, the risk of recidivism is exceedingly low. Therefore, a lengthy prison sentence would serve no preventive or rehabilitative purpose given the defendant's personal circumstances. Indeed, Congress has emphasized that in determining the extent and appropriateness of imprisonment, judges must recognize that "imprisonment is not an appropriate means of promoting correction and rehabilitation" (18 U.S.C. Section 3582).

As demonstrated above under §3553(a)(1), Mr. Flores acknowledges responsibility for his actions both as a defendant and as a human being, actively striving to rectify himself outside the confines of litigation. In this regard, Anthony has shown that even from late 2019 until his arrest in early 2023, he was

19

working and living a law-abiding life, much like he had done for most of his life. He is a person who holds down a job, has undertaken various ventures in his hometown of Fresno, and cherishes an active family life with strong familial and friendly bonds. His family consistently portrays him as a pillar of emotional support, someone dependable and trustworthy.

Even considering Mr. Flores' personal history, it is noteworthy how he has overcome adversity. Emerging from a middle-low class family, he has diligently worked, established businesses, and forged connections both locally and beyond. Throughout his journey, Mr. Flores has been a victim of abuse from a close family member—his uncle—and has experienced domestic violence from other family members, including his father, with whom he had a strained relationship until his late teens.

While custody is mandatory, it would serve primarily as punishment and a deterrent to others rather than a means of rehabilitation, especially considering that Anthony is already actively addressing his actions and their consequences. Pursuant to §3553(a)(2), the minimum sentence range of 27 months is more than sufficient to deter future misconduct and administer just punishment, enforcing the rule of law.

It is pertinent to recall that Anthony has accepted responsibility for his actions; thus, this punishment would primarily serve as a deterrent for others in similar circumstances, rather than directly addressing his individual case. Neither Anthony Flores nor the United States would benefit from an extended period of custody time beyond the minimum of the sentence range, as it would not serve the objectives of penology

20

or rehabilitation beyond the acknowledgment of his calculated Offense Level. This consideration is particularly pertinent given that this is Mr. Flores's first encounter with the criminal justice system, and he has been categorized with a Criminal History Category I, the lowest possible.

Finally, it is worth noting that Mr. Flores is eligible under the First Step Act (FSA) of 2018 (P.L. 115-391), as his charges are not among those that render inmates ineligible, and this would be his first conviction. Consequently, steps should be taken to begin the process of securing Anthony's eligibility to earn good conduct credits, especially considering his exemplary behavior since being incarcerated, without any incidents.

## VI. CONCLUSION

Throughout the Sentencing Memorandum, three central axes have been addressed regarding the sentence to be imposed: the circumstances surrounding the offense, the issue of the loss amount to be considered, and Mr. Flores's personal matters. All of these aspects allow for a clear and balanced assessment of the gravity of the offenses, taking into account that the most affected party in this case is a legal entity created by law. Furthermore, Mr. Flores's personal conditions permit the consideration of various personal factors that lead to an extremely low possibility of recidivism and the unnecessary imposition of an extensive prison sentence.

For these reasons, Mr. Flores' sentencing should be granted a variance to an 18 total point equivalent with a criminal history of I. He should be given a sentence of no more than 33-41 months

in custody, accompanied by a one-year term of supervised release and a $25,000 fine.

Respectfully submitted this 3rd day of June 2024.

/s/ Ambrosio E Rodriguez
Ambrosio E Rodriguez, Esq.
The Rodriguez Law Group
Attorney for Defendant